UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES OF AMERICA,
                                              OPINION & ORDER
          -against-                           92-CR-351(ARR)

MICHAEL SESSA,

               Defendant.
----------------------------------X


----------------------------------X

MICHAEL SESSA,

               Petitioner,
                                              OPINION & ORDER
          -against-                           97-CV-2079(ARR)

UNITED STATES OF AMERICA,

               Respondent.
----------------------------------X
ROSS, J.


**Table of Contents**

     Table of Contents........................................ 1
     I.    Introduction & Procedural Background................ 3
     II.  Petitioner's Trial.................................. 8
      A.  Background.......................................... 8
      B.  Evidence Adduced at Trial........................... 9
        1.  Petitioner's Position within the Colombo Family ... 9
        2.  The Murder of Anthony Coluccio .................... 10
        3.  Conspiracy to Murder Members of the Orena Faction  13
        4.  Loansharking Conspiracy ........................... 22

III.   The DeVecchio and Scarpa Scandal ................... 26

   A.   Scarpa's Criminal Activities ...................... 28

   B.   Scarpa's Cooperation with Law Enforcement ......... 30

   C.   DeVecchio's Misconduct ............................ 31

   D.   Discovery and Disclosure of Scarpa and DeVecchio
Information ............................................... 33

 IV.   Law Applicable to Petitioner's Post-Conviction Motions
       44

   A.   Rule 33 ........................................... 44

   B.   Section 2255 ...................................... 45

  V.   Timeliness of Petitioner's Post-Conviction Submissions
       46

   A.   Timeliness of Petitioner's Rule 33 Motion ......... 46

   B.   Timeliness of Petitioner's Section 2255 Petition ... 50

 VI.   Claims Common to Petitioner's Rule 33 Motion and
Section 2255 Petition ..................................... 58

   A.   Newly Discovered Evidence/Brady Violations ........ 58

     1.   The New York City Police Department Reports ...... 60

     2.   The Scarpa/DeVecchio Information ................. 71

     3.   Various Undisclosed Evidence ..................... 92

   B.   The Government's Outrageous Conduct ............... 93

VII.   Section 2255 Claims .............................. 103

   A.   DeVecchio's Perjured Testimony ................... 103

   B.   Linda Mae Kemble's Testimony ..................... 110

   C.   Jury Selection ................................... 114

   D.   Improper Jury Instructions ....................... 118

   E.   Improper Sentence ................................ 120

   F.   Elements of Loansharking ......................... 121

   G.   Ineffective Assistance of Trial Counsel .......... 125

   H.   Ineffective Assistance of Appellate Counsel ....... 135

VIII. The Requested Evidentiary Hearing ................. 138

 IX.   Petitioner's Motion to Remove Counsel and Appoint
Substitute Counsel ....................................... 143

  X.   Petitioner's Motion to Appoint a Special Prosecutor 147

 XI.   Conclusion ....................................... 150

I.   Introduction & Procedural Background

On November 12, 1992, following a two week jury trial before the Honorable Jack B. Weinstein, petitioner Michael Sessa was convicted of: (1) participating in the conduct of the Colombo organized crime family of La Cosa Nostra (the "Colombo Family") through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) ("Count One"); (2) conspiring to participate in the conduct of the Colombo Family through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) ("Count Two"); (3) conspiring to murder Anthony Coluccio ("Coluccio"), a Colombo Family associate, in violation of 18 U.S.C. § 1959(a)(5) ("Count Three"); (4) murdering Coluccio in violation of 18 U.S.C. § 1959(a)(1) ("Count Four"); (5) conspiring to murder those members of the Colombo Family loyal to Victor Orena (the "Orena Faction") in violation of 18 U.S.C. § 1959(a)(5) ("Count Five"); (6) conspiring to make extortionate extensions of credit in violation of 18 U.S.C. § 892 ("Count Six"); (7) conspiring to make extortionate collections of credit in violation of 18 U.S.C. § 894 ("Count Seven"); and (8) using and carrying a firearm in connection with crimes of violence, specifically Counts Three, Four, and Five, in violation of 18 U.S.C. § 924(c)(1) ("Count Eight").

On May 24, 1993, Judge Weinstein sentenced petitioner to a term of life imprisonment on Count One, a term of life imprisonment on Count Two, a ten-year term of imprisonment on Count Three, a term of life imprisonment on Count Four, a ten-year term of imprisonment on Count Five, a twenty-year term of imprisonment on Count Six and a twenty-year term of imprisonment on Count Seven. The terms of imprisonment on Counts One through Seven were to run concurrently. Additionally, Judge Weinstein sentenced petitioner to a consecutive five-year term of imprisonment on Count Eight, pursuant to 18 U.S.C. § 924(c). Judge Weinstein imposed cumulative fines in the amount of $250,000 per count, in the total amount of $2,000,000, and ordered petitioner to pay for the costs of his own imprisonment at the rate of $1,492 per month, as well as a special assessment of fifty dollars per count, for a total special assessment of $400.

On June 2, 1993, petitioner filed a Notice of Appeal with the United States Court of Appeals for the Second Circuit, asserting the following claims: (1) Counts One and Two failed to state an offense because the Colombo Family war negated the enterprise element of the racketeering charges; (2) the government elicited inadmissible and prejudicial evidence concerning prior conduct and other crimes at trial; (3) Judge Weinstein improperly "sequestered" the jury; (4) Judge Weinstein

4

improperly prohibited petitioner's counsel from eliciting expert character evidence concerning a government witness's propensity for untruthfulness; (5) the government improperly withheld various tape recordings; (6) the prosecutor improperly argued during his summation that petitioner placed individuals strategically in the courtroom to intimidate a witness; (7) a magistrate judge improperly conducted the jury selection; and (8) Judge Weinstein improperly sentenced petitioner based upon the history of organized crime and the criminality of others. Petitioner also filed a supplemental brief entitling his supplemental ground on appeal as "Trial Counsel was Ineffective," but arguing that testimony of a cooperating government witness, Joseph Ambrosino, contained improper hearsay and that the jury instructions concerning the government's burden of proof were constitutionally deficient. (Corrected Copy of Petitioner's Brief on Appeal at 87.) By Mandate issued on October 13, 1994, the Second Circuit affirmed petitioner's conviction in all respects. United States v. Sessa, 41 F.3d 1501 (2d Cir. 1994) (table). Petitioner did not file a writ of certiorari to the Supreme Court.

On October 11, 1996,[1] petitioner filed his motion for a new
trial pursuant to Rule 33 of the Federal Rules of Criminal
Procedure (the "Rule 33 Motion") arguing, _inter alia_, that he is
entitled to a new trial on the basis of newly discovered
evidence allegedly suppressed by the government at his trial.
The government opposed the Rule 33 Motion on March 2, 1999.

On April 22, 1997, petitioner filed a petition ("Petition")
for a writ of habeas corpus pursuant to 28 U.S.C. § 2255
("Section 2255").  The government opposed the Petition on June
2, 1997, but after petitioner failed to reply or otherwise move
the proceeding forward, on March 15, 2001, Judge Weinstein
dismissed the habeas case, and denied any pending motions in the
criminal case, for failure to prosecute.  (Sessa v. United
States of America, 97-CV-2097 ("Habeas Docket") No. 45.).

On July 31, 2001, because neither petitioner nor his
counsel was warned that the Petition would be dismissed for
failure to prosecute, Judge Weinstein reinstated the habeas case
and the Rule 33 motion.  On June 24, 2002, Judge Weinstein
recused himself from petitioner's habeas case and underlying
criminal case, and both cases were transferred to the Honorable
David G. Trager.  Several years and substitutions of attorneys
later, on March 16, 2009, petitioner filed a document entitled

---

[1] Petitioner amended his motion on November 20, 1996 to
correct various errors.

6

"First PETITION for Writ of Habeas Corpus."[2]  (Habeas Docket No. 45.)  The Amended Petition has been fully briefed since July 1, 2010.  On January 11, 2011, the habeas case and criminal case were transferred to the undersigned.

Currently pending in petitioner's cases are the following: (1) a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, filed on October 11, 1996, and amended on November 20, 1996 ("Rule 33 Motion"); (2) the Petition for a writ of habeas corpus pursuant to Section 2255, filed on April 22, 1997, and amended on March 16, 2009; (3) a motion for a writ of mandamus ordering the attorney general to appoint a special prosecutor, filed on May 27, 2009; (4) a motion for an evidentiary hearing, filed on July 28, 2010; and (5) a motion to remove counsel of record and appoint new counsel pursuant to the Criminal Justice Act (the "CJA"), 18 U.S.C. § 3006a, filed on August 8, 2010.

---

[2] Although this document is designated as a "First PETITION," it asserts different arguments from the Petition, and accordingly, will be referred to as the "Amended Petition."  See Ching v. United States, 298 F.3d 174, 177 (2d Cir. 2002) ("When a § 2255 motion is filed before adjudication of an initial § 2255 motion is complete, the district court should construe the second § 2255 motion as a motion to amend the pending § 2255 motion.").

II.  Petitioner's Trial

     A. Background

     The charges against petitioner arose primarily as a result
of his involvement with the Colombo Family of La Cosa Nostra in
the Eastern District of New York.  (Superseding Indictment
("Sup. Ind.") at ¶ 1.)[3]  La Cosa Nostra, "also known as the
Mafia, includes five New York families, the Bonnano, Colombo,
Gambino, Genovese, and Lucchese families, each headed by a
boss."  United States v. Orena, 32 F.3d 704, 708 (2d Cir. 1994).
In the 1980s, the Colombo Family was controlled by its boss,[4]
Carmine "Junior" or "the Snake" Persico, and its underboss,[5]
Gennaro "Gerry Lang" Langella.  (TT at 93:24-25; 94:8-12; 95:2.)
However, between November 1986 and January 1987, both Persico

_____

     [3] In preparing this Opinion, this court has relied upon
earlier proceedings in petitioner's case, evidence appended to
petitioner's and the government's papers, and evidence relied
upon by petitioner in advancing his arguments.  See Pham v.
United States, 317 F.3d 178, 184 (2d Cir. 2003) (noting that
"[a]mong the wealth of materials available to the district court
at its direction are the trial record, letters, documents,
exhibits, affidavits and written interrogatories").
     [4] The "Boss" is the "virtual dictator of [a] family, sets
the tone for the family, has knowledge of the criminal
activities of the family, sanctions murders when the boss feels
it is required to be done, settles disputes within the family,
and generally makes whatever rules he wishes to make and leads
that family into any illegal activities he desires.  (Trial
Transcript ("TT") at 89:3-9.)
     [5] The underboss is "second in command, may act if the boss
desires in his stead and his role is to insure that the policies
of the boss are adhered to by the membership of that family."
(TT at 89:10-14.)

and Langella were sentenced to "lengthy terms of imprisonment" and subsequently, a rift between two factions of the Colombo Family, those loyal to the incarcerated "Boss" Carmine Persico (the "Persico Faction"), and those loyal to the "Acting Boss[6]" Victor J. Orena (the "Orena Faction"), led to a violent internal war for control of the Family. (Sup. Ind. at ¶¶ 22, 23.) Each faction formed "hit teams" to monitor the movements of the opposing faction with the purpose of assassinating its members and associates. (Sup. Ind. at ¶ 23.) Petitioner was aligned with the Persico Faction, led by his brother, Carmine Sessa. (Sup. Ind. at ¶ 23.)

## B. Evidence Adduced at Trial

### 1. Petitioner's Position within the Colombo Family

At trial, the government offered the testimony of Joseph Ambrosino, a cooperating witness and former associate of the Colombo Family. Ambrosino testified that petitioner became a "made member[7]" of the Colombo Family in approximately December

---

[6] In May 1988, Carmine Persico selected Victor J. Orena to assume the position of "Acting Boss" while he was incarcerated. (Sup. Ind. at ¶ 10.) The Acting Boss is "an individual acting instead of the boss. Normally when the boss . . . is incarcerated, or is hiding, he will appoint someone to act in his stead . . . ." (TT at 90:24-91:1.)

[7] A made member, otherwise known as a "goodfella, a wiseguy, someone to be straightened out" or soldier (TT at 90:6; 201:21-22), is a "first-line individual who [is] involved in daily

1988.  (TT at 189-6-8; 202:4-7.)  In 1991, petitioner was
promoted to acting captain[8] for Robert Zambardi, who was facing a
parole violation charge at that time, and acted as the head of a
crew that included as members Ambrosino, Larry Fiorenza, Richie
Brady, Mike DeMatteo, Louie "Ganoli," Carmine Imbriale,[9] Michael
Bulino, Anthony Coluccio, Frankie "Steel" Pontillo and Anthony
"the Arab" Sayegh.  (TT at 189:23-190:11; 203:14-204:17.) During
the Colombo Family war, petitioner and his crew aligned
themselves with the Persico Faction.  (TT at 204:11-12.)
Petitioner was involved in and directed the various criminal
activities carried out by his crew, including, inter alia,
"loansharking, murder, attempted murders," the trade of illegal
firearms, and the use of fraudulent credit cards.  (TT at
183:20-21; 207:19; 262:2-12; 672:10-14; 676:13-16.)


2. The Murder of Anthony Coluccio

    Anthony "Bird" Coluccio, an associate of the Colombo
Family, and a member of petitioner's crew, was murdered in May

---

criminal activity or day-to-day criminal activity."  (TT at
90:2-4).
    [8] The captains or "capos . . . or skippers or caporegine or
capodecina" "would be commonly referred to as first line
supervisors [or] middle management . . . ."  (TT at 89:20-23.)
Each captain "has a number of men that answer to him, who are
known as his crew . . . ."  (TT at 89:25-90:1.)
    [9] Imbriale was a cooperating witness at petitioner's trial.

1989.  (TT at 219:20-220:1).  As part of petitioner's crew,
Coluccio primarily conducted loansharking activities, but he had
also "done some work with [petitioner's brother and Colombo
Family consiglieri[10] Carmine Sessa] and [petitioner], meaning
murders."  (TT at 221:9-10.)  During the several months prior to
his murder, Colluccio "was dealing drugs, was taking drugs, was
committing robberies, [and] was doing stupid things."  (TT at
220:20-21.)  In the winter of 1989, he was arrested with his
brother for possession of drugs while on his way to Atlantic
City, New Jersey.  (TT at 918:7-10.)  During a meeting between
petitioner, Imbriale, Coluccio's wife, and Michael Bullino, a
Colombo Family associate, petitioner learned of Coluccio's
arrest, and remarked that "Bird is up to his old shit again."
(TT at 920:8.)

        Fearing that, if arrested again, Coluccio would cooperate
with authorities, Carmine Sessa instructed petitioner and
Ambrosino to "kill [Coluccio] in the car and dump him off on
Third Avenue under the highway where the Puerto Ricans hang out,
in a drug infested neighborhood; let everybody think that the
drug dealers killed him."  (TT at 221:18-21.)  Several weeks

_____

        [10] The consiglieri, or counselor, is "[u]sually an
experienced member of the family, who advises the boss in many
of the important matters that he decides. He also acts as a
spokesman for the men . . . [and] has no crew of men under him."
(TT at 89:15-19.)

later, on May 15, petitioner called Ambrosino and instructed him
to meet petitioner to begin looking for Coluccio that night.
(TT at 222:10-13.)  Petitioner, Ambrosino, and Hank Smurra, a
made member of the Colombo Family, searched for Coluccio at his
regular hangouts to no avail, and abandoned their search at 1:00
a.m.  (TT at 222:14-17.)  They searched again the next night,
but still were unable to locate Coluccio.  (TT at 222:18-20.)

The next day, petitioner and Ambrosino were at their usual
meeting place on the corner of 13th Avenue and 69th Street at
approximately 3:00 p.m., when Coluccio arrived with Sayegh and
Billy, a Columbo Family associate.  (TT at 222:23-323:1;
223:11.)  Petitioner instructed Coluccio to return to the
meeting place at 8:00 p.m.  (TT at 223:6-7.)  While waiting for
Coluccio that evening, Ambrosino suggested to petitioner that
they take Coluccio to Staten Island instead of leaving his body
in Brooklyn.  (TT at 772:21-773:12.)  Petitioner agreed with
Ambrosino, believing that downtown Brooklyn was too crowded and
busy for them to carry out their plan.  (TT at 773:10-12.)

When Coluccio arrived at approximately 8:00 p.m., Ambrosino
told Coluccio that his "wife was having a problem with a
neighbor and [they] had to go to Staten Island to take care of
the neighbor."  (TT at 223:14-16.)  As Coluccio's right arm was
in a sling, petitioner instructed Coluccio to move to the
passenger seat and allow Ambrosino to drive, and petitioner sat

in the back seat on the passenger side.  (TT at 223:18-24;
224:2.)  Ambrosino drove towards Staten Island, followed by
Smurra in his own vehicle.  (TT at 223:18-21; 224:15-18.)  When
they were several blocks from Ambrosino's home, petitioner shot
Coluccio three times in the back of the head.  (TT at 225: 1-
10.)  Ambrosino pulled the vehicle over to the right side of the
road where he cleaned the steering wheel with his jacket, and
petitioner cleaned the door.  (TT at 225: 15-17.)  They walked
to Smurra's vehicle, approximately one block away, and drove
towards Rockland Avenue, making several turns along the way.
(TT at 226:11-12.)  Petitioner threw the gun into a storm drain
on Rockland Avenue, where an agent from the Federal Bureau of
Investigation ("FBI") recovered the weapon more than two years
later.  (TT at 794-96.)

### 3. Conspiracy to Murder Members of the Orena Faction

In June 1991, petitioner conspired with Carmine Sessa,
Ambrosino, Joseph "Lefty" Sangeorgio, an acting captain with the
Colombo Family, and other Colombo Family soldiers and associates
to murder members of the rival Orena Faction, including Colombo
Family acting boss Victor Orena and acting underboss Joseph
Scopo.  On June 20, 1991, Carmine Sessa received information
that the Orena Faction was planning to assassinate him the next

day, after he took part in a ceremony inducting several associates into the Colombo Family. (TT at 239:5-29.) Accordingly, the Persico faction planned to murder both Scopo and Orena that evening: Scopo near a club he commonly frequented on Fourth Avenue in Brooklyn, and Orena near his home on Long Island. (TT at 240:6-10.)

That night, petitioner waited at the Nebraska Diner in Coney Island, Brooklyn, with Ambrosino and others, while Smurra determined whether Scopo was at the club. (TT at 241:11-18; 242:11-13.) Smurra returned to the diner to report that Scopo was not at the club, and petitioner and Ambrosino then drove to Scopo's home in Mill Basin, Brooklyn, and saw Scopo's vehicle in the driveway. (TT at 242:1-5.) They returned to the diner and learned that Carmine Sessa's group targeting Orena on Long Island had been unsuccessful as well. (TT at 243:12-16.) "[S]uspecting that something might break out the following day," petitioner and several others fled to a safehouse in New Jersey to hide from the Orena Faction. (TT at 245:7-246:4.)

Thereafter, a committee comprised of members of each New York City-based La Cosa Nostra family successfully mediated a truce between the Orena and Persico Factions. (TT at 249:23-250:4.) However, in October 1991, four or five members of the Orena Faction opened fire at Gregory Scarpa, Sr. ("Scarpa") a made member of the Colombo Family aligned with the Persico

14

Faction, thereby ending the truce.  (TT at 254:11-255:5.)

Scarpa survived, but several other Persico Faction members,

including Smurra, were shot and killed in subsequent days.  (TT

at 255:13-20.)

    Believing that Billy Cutolo, a captain in the Colombo

Family aligned with the Orena Faction, and his crew attacked

Scarpa, the Persico Faction began hunting him.  (TT at 256:1-7.)

In November 1991, petitioner and several members of his crew,

including Ambrosino, met at Robert Montano's home in Staten

Island to plan Cutolo's murder.  (TT at 256:11-257:25.)  They

planned to drive to Cutolo's girlfriend's home off of Richmond

Hill Road in Staten Island, where Cutolo had recently been seen

with a group of approximately ten Orena Feaction members, and

"try to grab him, try to shoot him, kill him."  (TT at 259:3-

23.)  However, by the time petitioner, Ambrosino, and the other

Persico Faction members arrived at Cutolo's girlfriend's home,

each carrying a gun, Cutolo had already left.  (TT at 260:5-19.)

Accordingly, the group abandoned their plan and agreed to meet

the following Friday.  (TT at 21-25.)

    The Perisco Faction next planned to murder Cutolo on

Thanksgiving Day.  (TT at 262:13-18.)  Ambrosino testified that

he, petitioner, and Fiorenza "were going to dress up as Hasidic

Jews in costumes and murder [Cutolo] in front of his

girlfriend's grandmother's home in Brooklyn, [at] 60th Street

and 13th Avenue." (TT at 262:20-22; 263:18-19.) As the
"neighborhood that [Cutolo] was going to was an Hasidic
neighborhood, [petitioner, Ambrosino and Fiorenza] figured
[they] could blend in with the crowd." (TT at 262:25-263:1.)
Petitioner instructed Ambrosino to give six hundred dollars to
Sayegh so that he could purchase costumes from a store in
Brooklyn, and the costumes were stored at Fiorenza's
girlfriend's home, where she testified to seeing them. (TT at
264:2-9, 859-62.) See also Government Exhibit ("Gov. Ex.")
101.T at 8 (Ambrosino informing Frank Pontillo that they had
mustaches, beards, and other facial hair "from the Jewish (UI) .
. . in Larry's house" and that they "were gonna [sic] use that
for Thanksgiving on Billy"). However, on Thanksgiving morning,
a New York Post article implicated Scarpa as a government
informant, and fearing that Scarpa "knew about the plan and if
he was cooperating he would tell the law what [they] were going
to do," petitioner called off the murder. (TT at 265:13-266:5.)

In November 1991, petitioner, Carmine Sessa, Ambrosino, and
others made another attempt to murder Orena and Scopo. (TT at
268:22-270:2; 289:14-19.) Carmine Sessa "beeped" both
petitioner and Ambrosino, and informed them that Orena, Scopo,
and Tommy Petrizzo, a Colombo Family captain aligned with the
Orena Faction, had been spotted on the corner of 101st Avenue in
Ozone Park, Brooklyn. (TT at 268:22-270:2; 289:21-290:16.)

Carmine Sessa instructed petitioner, Ambrosino, and others to convene at a diner in Rockaway Park, Brooklyn, before heading to Ozone Park, but by the time they arrived, Orena and Petrizzo had left. (TT at 268:22-270:2; 290:21-23; 293:21-24) Moreover, by that time, Scopo was playing cards at a club with members of the Gambino crime family. (TT at 270:10-25; 294:9-10) Not wishing to accidentally shoot members of another crime family, Carmine Sessa and petitioner called off the "hit." (TT at 270:20-25; 294:12-15.)

In approximately November or December 1991, petitioner, Ambrosino, Imbriale and other Persico Faction members attempted to murder Michael "Spat" Spataro, a Colombo Family associate aligned with the Orena Faction, and a member of Cutolo's crew. (TT at 301:22-303:4.) They met at a pizzeria off of Amboy Road and Huguenot Avenue in Staten Island before driving to Spataro's home on Amboy Avenue. (TT at 302:18-24.) Carrying loaded weapons, petitioner and the group drove past Spataro's home in a white rental car. (TT at 203:2-12; 305:17.) Upon discovering that Spataro was not at home, they drove up and down Amboy Avenue for approximately ninety minutes, until they intercepted a police bulletin reporting a murder committed by men driving a similar white vehicle, and the group dispersed. (TT at 305:5-20.)

In January 1992, Carmine Sessa ordered petitioner, Ambrosino, and others to murder Frank "Frankie Notch" Iannaci, a Colombo Family associate aligned with the Orena Faction, and a member of Cutolo's crew. (TT at 295:14-25.) The group waited for Iannaci outside his apartment building in the Hamilton Houses on the corner of 101st Street and 4th Avenue in Brooklyn for approximately half an hour. (TT at 296:13-25.) When a Hamilton House security guard appeared, they left. (TT at 296:22-23.)

In the first several months of 1992, petitioner, Ambrosino, Imbriale, and other members of the Persico Faction set out to murder Joseph "Joe Campi" Campanella, a Colombo Family soldier aligned with the Orena Faction. (TT at 297:14-21; 298:8.) Initially, they targeted him at his home on Stillwell Avenue in Brooklyn, but when they did not see his vehicle in the driveway, they left. (TT at 298:11-299:6.) On another occasion, petitioner, Ambrosino and several others attempted to locate Campanella at his monument shop on 16th Avenue between 63rd Street and 64th Street in Brooklyn, but were similarly unsuccessful. (TT at 300:6-14.) Several additional attempts to locate Campanella at both locations failed. (TT at 300:15-17.)

In April 1992, petitioner, Ambrosino, Pontillo, DeMatteo and several others made the first of several attempts to murder "Bo Bo" Malpeso, a made member of the Colombo Family aligned

with the Orena Faction. (TT at 312:4-22.) Upon learning that
Malpeso's vehicle, a white Lincoln, was located outside a club
on McDonald Avenue in Brooklyn, petitioner planned to meet
Ambrosino, Pontillo, and the others on a nearby street corner.
(TT at 313:2-8.) However, before petitioner arrived, Pontillo
noticed a suspicious looking car, which the group believed
belonged to the police or the FBI. (TT at 313:11-13.) They
drove to a nearby auto mechanic shop on McDonald Avenue owned by
an acquaintance, and left the two guns they had been carrying in
their car at the shop, so as not to be stopped with them. (TT
at 313:14-314:2.) The group headed back to the club on McDonald
Avenue, but as the agents continued to follow the group,
Ambrosino beeped petitioner and redirected him from the club to
a Nissan dealership on Fourth Avenue and 62nd Street in
Brooklyn. (TT at 314:2-17.)

Several days later, petitioner and the same group returned
to the club on McDonald Avenue, and spotted a white Buick
Century belonging to Malpeso's girlfriend. (TT at 315: 12-21.)
Believing Malpeso was using his girlfriend's car, petitioner and
the crew waited outside the club until 10:00 p.m. (TT at 315:24-
316:15.) However, when the Buick pulled out of the club's
driveway, Malpeso was not in the car. (TT at 316:15-17.)
DeMatteo informed petitioner that Malpeso's girlfriend lived in
Mill Basin, Brooklyn, and the group split into two cars,

petitioner and Sayegh in one, and Ambrosino and others in another, and searched each block of Mill Basin for either Malpeso's Lincoln or his girlfriend's Buick.  (TT at 317:17-318:17.)  Ambrosino's group eventually located the Lincoln on 72nd Street near Avenue W, but petitioner had already left the neighborhood by that time.  (TT at 319:3-11.)

The next day, petitioner formulated a plan to murder Malpeso near his girlfriend's home, and petitioner's crew kept her home under surveillance on several different occasions before spotting Malpeso.  (TT at 319:20-320:9)  Petitioner parked on 72nd Street and Avenue T with a pair of binoculars, and when Malpeso left the house, petitioner made a left turn with his headlights on to signal that Malpeso was headed towards the other vehicles.  (TT at 321:3-16.)  The three other cars, driven by Ambrosino and other members of petitioner's crew, attempted to block Malpeso's car, but due to a miscommunication and an unexpected turn by Malpeso, Ambrosino failed to stop and Malpeso drove away.  (TT at 322:6-21.)  Pontillo fired at Malpeso as he drove away, but only hit the back window of Malpeso's car.  (TT at 322:22-323:18.)  Petitioner was angry with Ambrosino for failing to stop, and no further attempts were made on Malpeso's life.  (TT at 323:7-20.)  FBI Agent Robert Neuendorf testified that on October 22, 1992, he searched Malpeso's car pursuant to a search warrant and found bullet

fragments and evidence of bullet damage, corroborating Ambosino's account of the attempted murder.  (TT at 802-809.)

In June 1992, petitioner and a host of other Colombo Family members and associates, including, inter alia, Ambrosino, Carmine Sessa, and Scarpa, planned, yet again, to murder Cutolo. (TT at 327:7-329:14.)  On June 8, Ambrosino met with petitioner and Carmine Sessa, who had been planning the attack on Cutolo, and learned that on the following Saturday, June 13, a crew of seventeen made members and associates would attempt to kill Cutolo.  (TT at 329:16-19, 334:24-335:2.)  Petitioner informed Ambrosino that Pontillo, Fiorenza, DeMatteo, and Brady were designated as shooters, Ambrosino would either be a shooter or a driver, and petitioner would be involved as a shooter if the others needed help.  (TT at 335:11-336:10.)  The attempt was to take place on Forest Hill Road in Staten Island, near Cutolo's girlfriend's home, and petitioner's crew gathered stolen cars, machine guns, shotguns, bulletproof vests, and armor piercing bullets, and conducted test-drives of the escape route in preparation.  (TT at 336:11-338:18.)  The FBI had installed wiretaps in Ambrosino's car, however, and after hearing Ambrosino discussing the murder plot, they arrested Ambrosino and DeMatteo on June 10, before the plot could be carried out. (TT at 192:21-193:11.)  The remainder of the crew thereafter called off the murder plot. (TT at 193:1-11.)

4. Loansharking Conspiracy

The government also introduced evidence of petitioner's loansharking activities through Ambrosino's and Imbriale's testimony.  Loansharking, also known as shylocking, is the lending of money at very high rates of interest, and is one of the more common illegal business activities conducted by organized crime families in La Cosa Nostra.  (TT at 92:9-23.) Interest rates typically vary from one percent to five percent, and the interest, otherwise known as vig, vigorish, juice or points, is paid every week on the principal sum.  (TT at 92:24-93:12.)  By way of background, Agent DeVecchio gave the following example at trial of a typical loansharking transaction:

> [I]f someone borrows, say, five thousand dollars and
> pays five percent a week, the interest would be $250 a
> week on that loan, and the borrower would repay that
> two hundred and fifty every week until he was able to
> put five thousand dollars together in one lump sum and
> pay off the loanshark.

(TT at 93:3-8.)

Ambrosino testified that as a member of petitioner's crew, he often engaged in loansharking.  (TT at 207:17-19.) Over the course of four years, petitioner loaned Ambrosino approximately $170,000, for which Ambrosino paid petitioner one and one-half percent interest per week.  (TT at 207:21-

208:8.)  Ambrosino loaned that money to approximately

thirty to forty different people at interest rates varying

between three percent and five percent per week.  (TT at

208:9-23.)  Even if Ambrosino's customers did not pay him,

he was still responsible for his weekly payments to

petitioner, and accordingly, "if they didn't pay for a few

weeks, [he] would go after them, hit them."  (TT at 209:14-

23.)

Ambrosino further testified that petitioner similarly

loaned money to other members of his crew, including

Imbriale, who would then loan the money out to their own

customers.  (TT at 212:12-213:2.)  These crew members would

give Ambrosino the interest payments on their loans to pass

along to petitioner.  (TT at 213:16-18.)  In total,

Ambrosino estimated that petitioner had approximately

$200,000 of his own money "out on the street" as well as

approximately $220,000 for which petitioner paid Carmine

Sessa one point per week.  (TT at 214:12-216:9.)

Imbriale confirmed that petitioner loaned him

approximately $90,000 at two percent interest per week and

that Imbriale would occasionally make the payments to

Ambrosino.  (TT at 911:2-913:1.)  Imbriale likewise loaned

this money out to various customers at interest rates

between three percent and five percent per week. (TT at 911:15-912:12.)

Pursuant to a wiretap order, FBI agents had installed a listening device in Ambrosino's vehicle. (TT at 373-374.) Between June 9-10, 1992, they recorded numerous conversations had by petitioner's crew, which are replete with, <u>inter alia</u>, the following comments about petitioner's loansharking business:


Gov. Ex. 100.T at 7:

Ambrosino:    I'll be right out. Guy owes me money. I got to go see if he's got any money for Michael.


Gov. Ex. 109.T at 6:
Ambrosino:    I mean (UI) wrong with this guy's beeper and this kid's waiting for me in the street, got to give me money. I laid money out for him. I laid it out for Richie. Alex's money I laid out for Michael. He's waiting for me and I'm gonna leave, my money.


Gov. Ex. 110.T at 2-3:

Ambrosino:    I (UI) I give Richie 72 dollars a week to this guy. Seven thousand, two points, this guy's brother-in-law. I lay it out to Richie. I don't collect it. That's what I'm saying over here, what I go through. Now Richie is suppose to (UI) me now give this guy a crack if I have to. Well, I'm not gonna crack the guy.

Pontillo: Why?

Ambrosino:    'Cause it's only a week. What I wanted was to just scare him a little bit well I don't know

24

it's just (UI) what I'm trying to say.  I give Richie
$70.  Got the money this week tells me. . . .

Pontillo: Did he come up with that other money? . . .

Ambrosino:     . . . I told Richie keep his mouth
quiet.  I was going to whack it up with you guys
without Michael.  Two weeks ago I told you don't say
nothing to nobody.  He told Michael last week this
kid's gonna give the six thousand.  I was giving to
all of us. . . .  I shouldn't have told this fuckin'
guy.  I was shaking this kid down for $6,000.  Cause
(UI) whack it up for the, I told Richie a few weeks
ago.  He goes and tells Michael last week.

                    *  *  *

You understand what happens, two weeks ago I called
Richie on the side quiet said I got this kid's father
(UI) $6,500 of the bad money.

                    *  *  *

Pontillo:     What did he say?

Ambrosino:     Yeah, his father's cashing it for him
like they, they mature within the next couple of days,
in a week they're maturing.  He gave me the customers
when . . . He gave me the business.  He gave me the
customers for sixty-five but the customers he gave me
they're not paying.  So I told him (UI) they start
paying, they had no money, the guys, and he wasn't . .
. I want the money from you.  Pay points on it.  How
much ya want though just keep your fucking mouth quiet
(UI) . . . . I'll put a day's pay in everybody's
pocket, I said . . . Know what it is? He wants to be,
he wants to be welcome so bad over here that he thinks
by doing . . .

DeMatteo: He wants to make money, Joe.

Ambrosino:     Yeah, right, well that's it too.

DeMatteo: He wants to make money and for Michael
because he feels he's gonna make more money than he's
gonna make with you.

                        25

III. The DeVecchio and Scarpa Scandal

The improper relationship between Scarpa, a Colombo Family soldier and longtime FBI confidential informant, and DeVecchio, his FBI handler, has been the subject of countless post-conviction motions and civil suits, as well as books and magazine articles. See, e.g., Clemente v. Fed. Bureau of Investigation, No. 08-1252, 2010 WL 3832047 (D.D.C. Sep. 28, 2010) (request pursuant to the Freedom of Information Act, 5 U.S.C. § 552, seeking "any informant file on Mr. Scarpa, including in particular any Top Echelon ('TE') Informant File"); Grancio v. DeVecchio, 572 F. Supp. 2d 579 (E.D.N.Y. 2008) (asserting, inter alia, federal constitutional claims and tort claims against DeVecchio, alleging that he conspired with Scarpa to murder plaintiff's husband); United States v. Brady, No. CR-92-792, 1999 WL 438468 (E.D.N.Y. Apr. 30, 1999) (denying defendants' motion for a new trial based upon newly discovered evidence regarding the relationship between Scarpa and DeVecchio); Lee, Carol E. and Evan Thomas, *You Can Go Home Again: Prosecutors said he helped with mob hits, then their case unraveled. Now this G-man's hitting the beach,* NEWSWEEK, Nov. 26, 2007, at 44; Brick, Michael, *The Mafia, an F.B.I. Agent and Murder: Mr. Scorsese, Your Next Film Awaits*, N.Y. TIMES, Oct. 21, 2007, at A33; Fredric Dannen, *The G-Man and the Hit Man,* NEW

YORKER, Dec. 16, 1996. Scarpa and DeVecchio's misdeeds have even been fictionalized into the plots of movies and television shows. See Zeitchik, Steven and Matthew Belloni, *Real life puts a hit on mob pic*, HOLLYWOOD REPORTER, Aug. 20, 2009, at 1 (detailing a contract dispute jeopardizing the production of a movie based upon Scarpa's life); Lee, NEWSWEEK, supra (noting that an "incident, publicly reported years later as part of an internal FBI investigation into DeVecchio's handling of Scarpa, became the basis for a scene in 'The Sopranos' finale"). A comprehensive explanation of Scarpa's criminal activity, DeVecchio's misconduct in handling Scarpa and the disclosure of their relationship (hereinafter referred to as the "Scarpa/DeVecchio Information") is detailed at length in Judge Weinstein's opinion in Orena v. United States, 956 F. Supp 1071, 1085-89 (E.D.N.Y. 1997)[11] and Judge Sifton's opinion in United States v. Persico, No. 92-cr-351, 1997 WL 867788, at *7-17 (E.D.N.Y. Mar. 13, 1997), rev'd in part, United States v. Orena,

_____

[11] Judge Weinstein's opinion in Orena is based upon testimony from an evidentiary hearing held on February 28, 1997 in United States v. Michael Sessa, 92-CR-351, United States v. Victor Orena and Pasquale Amato, 92-CR-351, Pasquale Amato v. United States, 96-CV-1461, and Victor Orena v. United States, 96-CV-1474 (the "Feb. 28 Tr"). Petitioner declined the opportunity to participate in the examination of witnesses at this hearing with the knowledge that Judge Weinstein was "not going to repeatedly handle a complex matter involving witnesses." (Feb. 28 Tr., at 11.)

145 F.3d 551 (2nd Cir. 2008).  Accordingly, a brief summary
follows.


A. Scarpa's Criminal Activities

Scarpa "was a life-long associate of organized crime."
Orena, 956 F. Supp.at 1085.  By the early 1980s, he had fully
established himself as a member of the Colombo Family, and
routinely associated with other Colombo Family members and
associates.  Id.  Scarpa routinely engaged in credit card fraud,
extortion, gambling, narcotics trafficking, and loansharking,
and directed a crew out of the Wimpy Boys Social Club in
Brooklyn.  Id.  In 1986, Scarpa was indicted for the possession
and trafficking of fraudulent credit cards.  Pursuant to a plea
agreement, he faced up to seven and one-half years of
imprisonment, but ultimately was sentenced only to probation and
a $10,000 fine.  Id.  In 1987, the Drug Enforcement Agency
investigated the activities at the Wimpy Boys Social Club,
resulting in ten indictments.  Id.  However, Scarpa was not
among those indicted.  Id.

By the time of the Colombo Family War, Scarpa was an acting
captain in the family.  (TT at 187.)  Scarpa described himself
at that time as "the most powerful entity in the Colombo Family
and . . . an authoritative figure who bowed down to no one."
(Rule 33 Motion, Ex. 1 (Aff. of Margaret Clemons, May 24,

28

1994.))  During the war, Scarpa was a participant in numerous murders and murder attempts, including the attempt on Joe Campi, (TT at 301), the attempt on Billy Cutolo, (TT at 328), and the murder of Nicholas "Nicky Black" Grancio, (TT at 480), among others.  Several of the murders were committed because Scarpa had informed other Colombo Family members and associates that the victim was cooperating with law enforcement.  (Rule 33 Motion, Ex. 10 (Aff. of Jeffrey W. Tomlinson, June 26, 1994 ("Tomlinson Aff.") at 5.))  These criminal activities occurred during the time period in which Scarpa acted as a confidential informant to the FBI.  See infra § III(B).

On or about August 13, 1992, the King's County District Attorney's Office arrested Scarpa on a firearms charge.  (Rule 33 Motion, Ex. 8 (Aff. of George Stamboulidis, Jan. 27, 1995 ("Stamboulidis Aff")) at ¶ 9.)  That same day, the FBI arrested Scarpa, charging him with, inter alia, conspiracy to murder William Cutolo.  (Id.)  Although Scarpa was initially released on bail, in December 1992, he participated in a shooting, and was detained until released on home confinement due to his medical condition.  (Rule 33 Motion, Ex. 7 (Aff. of Andrew Weissman, Jan. 27, 1995 ("Weissman Aff.")) at ¶ 11.)  On February 4, 1993, Scarpa was indicted for his role in three murders, a murder conspiracy, and a firearms offense, and on May 6, 1993, Scarpa pleaded guilty to two counts of the Indictment.

(Stamboulidis Aff. at ¶ 13.)  On December 15, 1993, Scarpa was

sentenced to a ten year term of imprisonment and a five year

term of supervised release.  (Id., ¶ 15.)  Scarpa died in prison

in 1994.  New York v. De Vecchio, 468 F.Supp.2d 448, 451

(E.D.N.Y. 2007).


    B. Scarpa's Cooperation with Law Enforcement

    Scarpa is rumored to have assisted the FBI since the early

1960s, when he purportedly aided the FBI's recovery of the

bodies of three civil rights workers kidnapped and murdered by

the Mississippi Ku Klux Klan.  Orena, 956 F. Supp. at 1086.

(See also Rule 33 Motion, Ex. 18 (Summary of FBI Interview with

Carmine Sessa, Apr. 18, 1994 ("Sessa Interview")), at 2

(describing Scarpa's rumored cooperation in the 1960s and

1970s.))  However, FBI internal briefing memoranda known as

"Form 209s," indicate that Scarpa's cooperation with law

enforcement dates back to at least 1980.  Persisco, 1997 WL

867788, at *10; Orena, 956 F. Supp. at 1086.  As a confidential

informant, Scarpa provided the FBI with extensive information

pertaining to the Colombo Family War, including information

relating to changes in family leadership, the induction of new

members, murders and attempted murders, meetings between the

Persico and Orena factions, and temporary truces.  (Rule 33

Motion, Ex. 12A-12Z.)  Scarpa was closed as an informant on

March 3, 1992, after rumors spread that he was conspiring to murder another Colombo Family member.  <u>Orena</u>, 956 F. Supp. at 1086.  However, the FBI restored his informant status only one month later, on April 8, 1992.  <u>Id.</u>  Scarpa was paid by the FBI for his information, and he also expected to receive a lenient sentence in the event he was convicted of a crime.  (<u>See</u> Rule 33 Motion, at 41 (quoting Scarpa Sentencing Tr., Dec. 15, 1993) ("I expect to go home . . . .  I tried to help, Your Honor, I am sure you're aware of that . . . .  I thought there was a possibility of me going home.")).

        C. DeVecchio's Misconduct

    DeVecchio acted as Scarpa's sole FBI handler from December 1980 until the FBI terminated Scarpa's informant status in 1992, despite FBI protocol dictating that all informants be handled by two agents at a time.  <u>Orena</u>, 956 F. Supp. at 1056.  While acting as Scarpa's handler, DeVecchio made numerous unauthorized disclosures of information to Scarpa.  During preparations for Orena's 1995 trial before Judge Korman, and pursuant to an order by Judge Korman, the government disclosed the following list of unauthorized disclosures believed to be made by DeVecchio to Scarpa:

    A. the planned 1987 arrest by the DEA of Greg Scarpa, Jr. and his crew, and that law enforcement believed

that Cosmo Catanzano was a "weak link," who might
cooperate with authorities if arrested;

B. on or about February 27, 1992, that Carmine
Imbriale was cooperating with law enforcement;

C. during the Colombo family war, information on at
least one member of the Orena faction who had a hit
team that was looking for members of the Persico
faction;

D. following the arrest of Joseph Ambrosino, that
there were arrest warrants pending for Lawrence Mazza
and James DelMasto (two of Scarpa's closest
associates), but that if they stayed away from their
normal "hangouts," they could avoid being arrested;

E. in or around January 1992, that it was believed
that Orena was staying at his girlfriend's house, the
location of which (as then known by some in law
enforcement) was also conveyed;

F. in or around January 1992, the address of the house
in which Salvatore Miciotta was residing; and

G. in early 1992, subscriber information for telephone
numbers of two of Scarpa's loanshark customers;

H. in the mid to late 1980's, that Scarpa's social
club was subject to court-ordered electronic
surveillance and that he would soon be arrested on
charges involving dealing with fraudulent credit
cards.

(Rule 33 Motion, Ex. 11 (Letter from Ellen M. Corcella,

A.U.S.A., to Defense Counsel in the Orena Case Before Judge

Korman, dated May 8, 1995.))  In addition to disclosing

confidential information, DeVecchio ensured that Scarpa retained

his confidential informant status while engaging in violent

criminal activity, in violation of the FBI's informant policy.

Orena, 956 F. Supp. at 1087.  Although Donald North, the Assistant Special Agent in Charge of the Criminal Division of the New York FBI Office and DeVecchio's superior, closed Scarpa as an informant after discovering evidence of his criminal activity, DeVecchio singlehandedly reopened Scarpa as an informant only one month later.  Id.  Moreover, DeVecchio represented to FBI headquarters that the information concerning Scarpa's criminal activity was false, yet informed FBI Special Agent Christopher Favo that Scarpa confirmed engaging in such criminal activity.  (Feb. 28 Tr.), at 51-52.)

        D. Discovery and Disclosure of Scarpa and DeVecchio
           Information

    Throughout the investigation and prosecution of various Colombo Family members and associates between 1992 and 1994, several FBI agents and Assistant United States Attorneys ("AUSAs") slowly uncovered information concerning DeVecchio's misconduct and improper relationship with his informant. Initially, agents working alongside DeVecchio merely believed that he was not pursuing the investigation as diligently and meticulously as he should have.  It was not until several Colombo Family defendants agreed to cooperate with the government that more specific allegations regarding DeVecchio's leaks of information came to light.

The first sign of any wrongdoing on DeVecchio's part was noted in late 1991 or early 1992, when DeVecchio and Special Agents Jeffrey Tomlinson and Raymond Andjich visited Scarpa's home on a routine visit. (Tomlinson Aff., at 2.) DeVecchio instructed Tomlinson and Andjich to wait in the living room while he and Scarpa had a forty-five minute discussion in the kitchen. (Id.) Tomlinson could not hear what was discussed, but believed that DeVecchio's written summary of his conversation seemed brief in comparison to its length. (Tomlinson Aff., at 2.)

On or about February 27, 1992, Favo learned that Carmine Imbriale had been arrested by, and was cooperating with, the Kings County District Attorney's Office. (Feb. 28 Tr., at 107-110.) As Favo conveyed this information to DeVecchio, the "hello" phone, the secret phone in the FBI headquarters that informants use to contact their handlers, rang. (Id.) DeVecchio answered the phone, and moments later, Favo overhead him say, in sum and substance, "I don't know if he is saying anything about you, he is – the Kings County District Attorney's Office has him." (Id.) Favo asked DeVecchio who he was speaking to, and DeVecchio answered "34," his code number for Scarpa. (Id.) The next day, still disturbed by DeVecchio's statement, Favo confronted him and accused him of disclosing Imbriale's cooperation with law enforcement to Scarpa. (Id.) To

remedy the disclosure, Favo suggested that DeVecchio warn Scarpa that he had been overheard on a wire advocating for Imbriale's murder, and would be the prime suspect if anything happened to Imbriale. (Id.) According to Favo, DeVecchio implied that he "took care of it." (Id.)

Favo was again troubled by DeVecchio's actions several months later. On May 22, 1992, Favo learned that Larry Lampesi and another individual were targeted in a shooting. (Feb. 28 Tr., at 46.) Lampesi was killed and the other individual was seriously wounded. (Id.) When Favo reported the shootings to DeVecchio, DeVecchio:

> slapped his hand on the desk and he said, "We're going to win this thing," and he seemed excited about it. He seemed like he . . . didn't know we were the FBI or that he was not on our side. A line – it was like a line had been blurred... over who we were and what this was... I just thought he was not – I thought there was something wrong.

(Id.) According to Favo, DeVecchio reacted as though he were "a cheerleader for the Persico faction. The reaction he gave that morning wasn't consistent with the reaction that anybody that was working hard on the case would give." (Id. at 47:13-17.) Due to this incident, Favo believed that DeVecchio "was not as serious about this investigation, this war, as he should have been" and that "he was careless when dealing with this informant." (Id. at 48.)

Tomlinson also found DeVecchio's relationship with Scarpa to be troublesome. (Tomlinson Aff., at 8-9.) Although the FBI had classified Scarpa as a Top Echelon source, the FBI received very little information from him during the Colombo Family war. (Id.) Moreover, through debriefings of Imbriale and Ambrosino, Tomlinson learned that Scarpa murdered Nicholas "Nicky Black" Grancio, and Tomlinson was "confident that [this information] was provided to SSA DeVecchio." (Id.) Tomlinson could not understand why, after learning this information, DeVecchio would continue to operate Scarpa as an informant. (Id.)

In June and July of 1992, during the height of the arrests of individuals associated with the Colombo Family, Tomlinson remembers DeVecchio instructing Favo not to arrest anyone else without DeVecchio's prior approval because paperwork was getting backed up. (Id. at 9.) Tomlinson "couldn't understand why the handling of paper was significant because [they] were making arrests in order to stop subsequent killings." (Id.) Similarly, Special Agent Howard Leadbetter, II, witnessed DeVecchio, "in a very forceful tone of voice, tell SA Favo, 'I've had it! You will not arrest another single individual without my specific approval!'" (Rule 33 Motion, Ex. 15 (Aff. of Howard Leadbetter, II ("Leadbetter Aff.")) at 3-4.) Leadbetter found this statement to be unusual as the squad typically did not have to seek DeVecchio's prior approval before

making arrests.  (Leadbetter Aff., at 4.)   Several months

later, Leadbetter learned that Scarpa was DeVecchio's

confidential informant, and "began to believe that it was

possible that SSA DeVecchio was attempting to interfere with or

otherwise stall the development of the investigation as it

related to Gregory Scarpa."  (Id.)

By the time petitioner's trial commenced in October 1992,

the FBI had concerns about DeVecchio's handling of his informant

and the related investigation, but they did not know the full

extent of his misconduct.  The AUSAs knew that Scarpa was a

confidential informant, but had not reviewed any Form 209s

concerning Scarpa nor learned what specific information he

provided to the FBI.  (Stamboulidis Aff., at ¶¶ 4(a), 7;

Weissman Aff., at ¶ 4.)  However, Weissman noted that it was

"made clear to [him] that Scarpa had committed crimes during the

Colombo Family war in violation of the FBI's instructions not to

engage in such crimes."   (Weissman Aff., at ¶ 4.)

The bulk of the revelations of DeVecchio's misconduct were

discovered during the debriefings of cooperating witnesses

associated with the Colombo Family.  On April 4, 1993, the FBI

arrested Carmine Sessa, and after he agreed to cooperate with

the government, Agent Tomlinson handled his debriefings.

(Tomlinson Aff., at 7.)  Sessa informed Tomlinson that during

the DEA's investigation of the Wimpy Boys Club in the mid-1980s,

Scarpa possessed a list of the individuals who were arrested before the arrests occurred, and Sessa believed that Scarpa received that list from someone in law enforcement. (Id. at 5-6.) Later, in 1987, Gregory Scarpa, Jr., confirmed to Sessa that his father had a law enforcement source, and Scarpa, Jr. believed that source to be in the Brooklyn District Attorney's Office, or some other law enforcement agency. (Id. at 6.)

Sessa also recalled several instances where Scarpa appeared to be unconcerned about the presence of "bugs" or electronic listening devices. (Id. at 6-7.) While at a luncheonette with Scarpa and Anthony Scarpatti, Sessa heard Scarpatti warn Scarpa that he should check the luncheonette for bugs. (Id.) However, when Scarpatti left, Scarpa told Carmine Sessa that it was not necessary to conduct the search. (Id.) On another occasion, Sessa found a bug on a telephone line at the Wimpy Boys Club. He gave the bug to Scarpa, but Scarpa, insisting that the device was not a bug, instructed Sessa to forget about it. (Id.) Sessa nevertheless sought a second opinion from a private investigator, who confirmed that the equipment was indeed a bug. (Id.) Sessa was confused as to why Scarpa was not concerned about his telephone conversations being monitored, and became suspicious that Scarpa was cooperating with law enforcement. (Id.)

Scarpa was hospitalized for a stomach ulcer in the late 1980s, and both Sessa and Sessa's wife visited him at the hospital. (Id. at 7-8.) During one visit, Scarpa's girlfriend, Linda Schirro, informed Sessa that Scarpa's "friend" had called him and told him that he was not going to have to go to jail. (Id.) On another visit, Scarpa instructed Sessa not to visit him the next day, but Sessa's wife, unaware of Scarpa's instructions, went to the hospital anyway. (Id.) Before reaching Scarpa's room, she encountered Schirro in the hallway, who told Mrs. Sessa that she could not go into Scarpa's room as there were three out-of-town bosses visiting Scarpa at the time. (Id.) However, Sessa knew that there were no out-of-town bosses visiting at that time, and suspected that the men were actually law enforcement. (Id.) Thereafter, while answering telephone calls at the Scarpa home while Scarpa was still hospitalized, Mrs. Sessa answered several calls from "Mr. Dello." Sessa believes that "Mr. Dello" was really DeVecchio. (Id. at 7-8.) DeVecchio's attendance at Sessa's FBI debriefing sessions and attempts to speak to Sessa strengthened Sessa's suspicions that DeVecchio was Scarpa's law enforcement source. (Id. at 7.)

During the late 1980s, other Colombo Family members suspected Scarpa of cooperating with law enforcement, and there were discussions amongst the members about whether Scarpa would need to be murdered. (Id. at 8.) However, Scarpa dispelled

rumors of his cooperation by committing murders, as his Colombo Family superiors would not believe "that if he was being operated by law enforcement, that the law enforcement officers would allow him to be involved in murders." (Sessa Interview at 6.)

Just after Ambrosino's arrest, Sessa was with Scarpa at a hotel in southern New Jersey. (Tomlinson Aff., at 10.) Scarpa got "beeped" and told Sessa that he was going to call his doctor. (Id.) However, when he returned, he seemed very relaxed, and Sessa believes he called his law enforcement source, not his doctor. (Id.)

Finally, Scarpa warned Sessa that he should not to go to court for his probation violation hearing on July 2, 1992. (Id. at 9.) Sessa took Scarpa's advice and failed to appear at the hearing. (Id.) Petitioner, however, appeared at the hearing, where the FBI arrested him. (TT at 1108-09.)

Several months after Sessa's arrest and debriefing, William Meli, an incarcerated member of the Colombo Family, also agreed to cooperate and was debriefed by Special Agent Howard Leadbetter. (Leadbetter Aff., at 6.) Meli stated that in 1987, Scarpa, Jr. told him that his father had a friend who was an FBI agent. (Id.) This agent warned Scarpa that the DEA intended to arrest several members of Scarpa, Jr.'s crew, and that they believed that Cosmo Catanzano would cooperate with law

enforcement when arrested. (Id.) Accordingly, Scarpa, Jr.
instructed Meli to make preparations to murder Catanzano, but
Meli and the others were arrested before they could do so.
(Id.) Meli also recalled that either Scarpa or Kevin Granato
planned to obtain a television or a VCR to give to Scarpa's FBI
agent. (Id. at 7.) However, Meli did not remember whether any
gift was actually provided. (Id.)

In January 1994, Favo informed Assistant Special Agent in
Charge North that several cooperating defendants believed Scarpa
had a law enforcement source, and that some of the information
attributable to the source related to the Colombo Family war.
(Favo Aff., at ¶ 5.) At approximately this time, the AUSAs
learned of allegations of DeVecchio's misconduct. (Stamboulidis
Aff., at ¶ 5.) However, they did not discover the full scope of
the allegations, and believed that the FBI investigation of
DeVecchio was merely an internal FBI matter and not a situation
related to the Colombo Family trials. (Corcella Aff., at ¶ 9.)

On March 9, 1994, after Larry Mazza agreed to cooperate,
Special Agent Maryann W. Goldman conducted his debriefing and
drafted an FBI Form 302 describing how Scarpa told Mazza that he
received information from a law enforcement source, commonly
referred to as "the Girlfriend." (Favo Aff., at ¶ 2; Rule 33
Motion, Ex. 2 (FBI Form 302, Mar. 9, 1994 (the "Girlfriend

302")))．  The information Scarpa attributed to "the Girlfriend"

included:

> The address of VICTOR ORENA's girlfriend's home in
> Queens, New York, including descriptive information
> that it was a white, two family home with aluminum
> siding.  Shortly after SCARPA SR. is shot at, he
> learns that the panel truck used in the murder attempt
> was rented from Queens, New York.  The address for
> JOSEPH RUSSO, an associate of WILLIAM CUTOLO, on 74th
> Street near 12th or 13th Avenue, as well as SALVATORE
> MICIOTTA and JOSEPH SCOPO'S addresses.  He also
> received information regarding the scheduled drug
> arrest of GREGORY SCARPA JR. and his crew, and the
> scheduled Credit Card arrest of SCARPA SR.. [sic]  He
> received a copy of the Complaint issued against
> himself, and was told that his problems with the law
> might disappear if he stayed out of trouble.

(Girlfriend 302, at 1.)  Mazza further stated that:

> On one occasion, MAZZA was in SCARPA SR.'s house when
> he received a telephone call from "the Girlfriend" on
> the basement telephone. After the call, he told MAZZA
> that the "Girlfriend" said that the members of the
> ORENA faction were very close to killing him. . . .
> SCARPA SR. received another call from this source
> while he was on bail. During this call, "the
> Girlfriend" told SCARPA SR. that if there were no more
> shootings, MAZZA and DELMASTO might not be in too much
> trouble with the Law. "The Girlfriend" also told
> SCARPA SR. that his bail was close to being revoked.
>
> The "Girlfriend" said that he was concerned about
> SCARPA SR., and that he should be careful. SCARPA SR.
> was noticeably concerned after these telephone calls,
> and always trusted the information he received from
> this source.

(Girlfriend 302, at 1-2.)

That same month, Mario Parlagreco, one of Scarpa, Jr.'s

codefendants in the DEA complaint, confirmed that Scarpa

received information about the 1980s DEA arrests.  During his

debriefing session, he reported that approximately four months before his arrest on the DEA charges, Scarpa warned him that the DEA was planning to arrest members of Scarpa, Jr.'s crew. (Leadbetter Aff., at 7-8.)  Scarpa showed Parlagreco a list of individuals who the DEA planned on targeting that he had obtained from his law enforcement source. (Id.)  These individuals were all involved in the illegal drug distribution network operated by Scarpa and Scarpa, Jr. (Id.)  Parlagreco's name was not on the list. (Id.)  However, approximately one month later, Scarpa showed Parlagreco a new list containing additional names, including Parlagreco and his brother. (Id.)  Scarpa told Parlagreco that everyone on the list, with the exception of Scarpa, Jr. and Parlagreco, was instructed not to flee from arrest. (Id.)  Yet, the next day, Scarpa reversed his prior statement, and instructed Parlagreco not to free from arrest as well. (Id.)  He also advised Parlagreco not to discuss business with Eric Leon as Scarpa had been informed that Leon was wearing a wireless recording device. (Id.)  According to Parlagreco, each individual on the list was subsequently arrested by the DEA. (Id.)

Thus, by March of 1994, the FBI was well aware that DeVecchio had made unauthorized disclosures to his confidential informant.  However, Favo and the other FBI agents did not disclose the Form 302s containing information about DeVecchio's

misconduct to the AUSAs until authorized by the investigators from the FBI's Office of Professional Responsibility several months later (Favo Aff., at ¶ 5; Stamboulidis Aff., at ¶ 7; Weissman Aff., at ¶¶ 16, 25-26.)

IV.  Law Applicable to Petitioner's Post-Conviction Motions
    A. Rule 33

Rule 33 of the Federal Rules of Criminal Procedure permits district courts to grant a criminal defendant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, a motion for a new trial "should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003).  See also United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 1997) (the ultimate test on a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice").  Before granting a defendant's motion pursuant to Rule 33 and ordering a new trial, a court must find that there is "a real concern that an innocent person may have been convicted." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992).  The "standard for evaluating [a Rule 33] motion is dependent upon the particular claim asserted." Orena, 956 F. Supp. at 1090.

B. Section 2255

Section 2255 permits a prisoner in custody under sentence of court to move the court that imposed the sentence to vacate, correct, or set aside such sentence.  However, "[n]ot every error of law constitutes grounds for relief under section 2255." United States v. Escobar, 863 F. Supp. 131, 131 (S.D.N.Y. 1994). Petitioner must instead demonstrate that his "sentence was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255.

Not every claim brought by a petitioner is cognizable under Section 2255.  First, "[i]t is well established that a § 2255 petition cannot be used to 'relitigate questions which [sic] were raised and considered on direct appeal.'" United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (internal quotation marks and citation omitted).  This rule "prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010).  Moreover,

"a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review," unless the claim is one asserting ineffective assistance of counsel, or "petitioner establishes either (1) 'cause' for the failure to bring a direct appeal and 'actual prejudice' from the alleged violations; or (2) 'actual innocence.'"  Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007)(quoting Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)).

V.   Timeliness of Petitioner's Post-Conviction Submissions

A. Timeliness of Petitioner's Rule 33 Motion

Rule 33 currently provides that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(1).  However, at the time of petitioner's verdict, the rule required that any motions for a new trial based upon newly discovered evidence "be made before or within two years after final judgment," see Fed. R. Crim. P. 33 (amended 1998), which courts construed as "the date the mandate of the court of appeals issues."  United States v. Reyes, 49 F.3d 63, 66 (2d Cir. 1995).  Petitioner filed his Rule 33 motion on October 11, 1996, more than three years after his guilty verdict on November 12, 1992, but less than two years after the Second Circuit's

mandate on October 13, 1994. Accordingly, petitioner's motion
is untimely under the current version of Rule 33, but timely
pursuant to the version of Rule 33 in effect at the time he
filed his motion.

When adopting the amendment to Rule 33, the Supreme Court
indicated that the amended statute would "govern all proceedings
in criminal cases thereafter commenced and, insofar as just and
practicable, all proceedings in criminal cases then pending."
Order of April 24, 1998 of the Supreme Court of the United
States Adopting and Amending the Federal Rules of Criminal
Procedure, 523 U.S. 1229 (1997). Thus, the current version of
Rule 33 will apply, and petitioner's motion will be deemed
untimely, only if it is just and practicable.

While the Second Circuit has not directly addressed this
question, see United States v. Spencer, 83 Fed. App'x 391, 392
(2d Cir. 2004) (declining to resolve the question "because
nothing turn[ed] on it"), other circuits have on occasion found
it just and practicable to retroactively apply amended Rule 33
to bar a defendant's Rule 33 motion. In United States v.
Mojica-Rivera, the First Circuit held that it was just and
practicable to apply amended Rule 33 where defendant was
convicted on June 6, 1997, and after the amendment took effect
on December 1, 2008, "had until June 6, 2000-more than eighteen
months-to file a motion for a new trial based on newly

47

discovered evidence." United States v. Mojica-Rivera, 435 F.3d 28, 33 (1st Cir. 2006). Likewise, in United States v. Ristovski, the Sixth Circuit found the application of amended Rule 33 to be just and practicable where the defendant had nineteen (19) months from the date the amendment came into effect in which to file a motion for a new trial. United States v. Ristovski, 312 F.3d 206, 212 (6th Cir. 2002).

However, courts are less likely to find the application of amended Rule 33 to be just and practicable where its application would cause a defendant's time period to file a Rule 33 motion to expire before the amendment even took effect. In United States v. Bowler, the Fifth Circuit held that although courts generally apply procedural rules as they exist at the time of the decision, a manifest injustice would result "if the new Rule 33 were applied, [and] [defendant] would have been required to file his Rule 33 motion almost five months before the amended Rule was effective." United States v. Bowler 252 F.3d 741, 746 (5th Cir. 2001). See also United States v. Jasin, No. 91-602-08, 2000 WL 1793397, at *2 (E. D. Pa. Nov.22, 2000) ("It would be entirely anomalous to apply the current time limit to defendant's motion. Doing so would mean that the motion was barred before amended Rule 33 came into effect.") The Southern District of New York adopted this reasoning in United States v. Soler, when it declined to apply the time limit set forth in

amended Rule 33 where it did not take effect until more than three years after the defendant's verdict.  United States v. Soler, No. 94 CR. 533, 2000 WL 385514, at *1 (S.D.N.Y. Apr. 17, 2000).  The court noted that defendant had a right to rely on the statute in effect at the time.  Id.  Moreover, there was no just or practicable way to apply the new rule to defendant where doing so "would mean that [his] motion was barred before the revision of Rule 33 even came into effect."  Id.

The circumstances surrounding the timing of petitioner's Rule 33 motion are more akin to the defendants in Soler, Bowler, and Jasin than in Mojica-Rivera or Ristovski.  Applying the amended version of Rule 33 to petitioner would essentially foreclose petitioner's motion after a date preceding not only the effective date of the amendment, but also the date of the amendment's adoption, by over two years.  Like Mr. Soler, petitioner "surely had a right to rely on the old version of Rule 33 as long as it was effective."  Soler, 2000 WL 385514, at *1.  Accordingly, it is neither just nor practicable to apply the amended version of Rule 33 to petitioner, and therefore, applying the pre-1998 version of Rule 33, petitioner's Rule 33 motion is timely.

B. Timeliness of Petitioner's Section 2255 Petition

In its Opposition to the Petition, the governments argues
that the Petition is untimely.  (Gov. Opp. Pet. at 4-5.)
Petitioner filed his first Petition on April 22, 1997.  The
Antiterrorism and Effective Death Penalty Act (the "AEDPA"),
enacted on April 24, 1996 and modifying Section 2255,
established a one-year statute of limitations for petitions
brought pursuant to Section 2255.  See Pub. L. 104-132, Title I,
§ 105 (codified at 28 U.S.C. § 2255).  The one-year limitations
period typically runs from the latest of "the date on which the
judgment of conviction becomes final."  28 U.S.C. § 2255(f)(1).

Petitioner's conviction became final on January 11, 1995,
ninety days after the Second Circuit affirmed petitioner's
conviction and his time to file a petition for a writ of
certiorari to the Supreme Court expired.  See Clay v. United
States, 537 U.S. 522, 525, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003)
(holding that a federal conviction becomes "final" under 28
U.S.C. § 2255 "when the time expires for filing a petition for
certiorari contesting the appellate court's affirmation of the
conviction"); see also Sup.Ct. R. 13 (setting the expiration of
time for filing a petition for certiorari at ninety days).
However, as petitioner's conviction became final prior to the
enactment of the AEDPA, instead of running from the date his
conviction became final, the limitations period instead runs

50

from the date of the AEDPA's enactment.  See Mickens v. United
States, 148 F.3d 145, 148 (2d Cir. 1998) (holding that "that the
limitations period prescribed by § 105 of AEDPA does not bar a
§ 2255 motion filed within one year after the effective date of
the Act").  Accordingly, as petitioner filed his Petition within
363 days of the enactment of the AEDPA, his initial Petition is
timely.  Id. (noting that "motions pursuant to § 2255 are not
barred by the statute of limitations established by AEDPA if
filed on or before April 24, 1997").

However, the analysis of timeliness does not end there.  On
March 16, 2009, petitioner filed an Amended Petition, titled
"First PETITION for Writ of Habeas Corpus."  It appears that
sometime between 1997 and 2008, the Petition filed in 1997 was
lost.  The government notes in its Opposition to the Amended
Petition ("Gov. Opp. Am. Pet.") that:

> [t]he government, however, has reviewed its file
> and the court's files for both Civil Docket
> Number 97-2079 (opened when Sessa filed his
> petition) and Criminal Docket Number 92-351
> (Sessa's underlying criminal conviction) and has
> consulted with defense counsel, and has not been
> able to locate a copy of Sessa's initial
> petition.

(Gov. Opp. Am. Pet. at 25-26.)  The government argues that due
to the loss of the Petition and the lengthy delay before the
filing of the Amended Petition, "the government cannot identify
which of the claims raised by Sessa in his [Amended Petition],

51

if any, were raised in Sessa's initial [Petition], and thus,
cannot evaluate whether any of the new claims "relate back" to
prior claims raised by Sessa."  (Id. at 32-33.)  Accordingly,
the government contends, due to the unfair prejudice to the
government, "[t]he only appropriate remedy is to deny Sessa's
petition in its entirety as untimely."  (Id.)  However, a copy
of the Petition has since surfaced in the court's files, and
accordingly, I may determine whether petitioner may amend his
Petition to include the claims set forth in the Amended
Petition.  See Ching v. United States, 298 F.3d 174, 177 (2d
Cir. 2002) (concluding that "when a § 2255 motion is filed
before adjudication of an initial § 2255 motion is complete, the
district court should construe the second § 2255 motion as a
motion to amend the pending § 2255 motion").

    The standard for granting or denying a motion to amend a
Section 2255 petition is governed by Rule 15(a) of the Federal
Rules of Civil Procedure.  See Littlejohn v. Artuz, 271 F.3d
360, 363 (2d Cir. 2001).  See also 28 U.S.C. § 2242 (stating
that a petition for a writ of habeas corpus may be "amended or
supplemented as provided in the rules of procedure applicable to
civil actions").  "[A]lthough Rule 15 requires that leave to
amend be 'freely given,' district courts nonetheless retain the
discretion to deny that leave in order to thwart tactics that
are dilatory, unfairly prejudicial or otherwise abusive."

<u>Littlejohn</u>, 271 F.3d at 363.  As the statute of limitations on petitioner's claims expired on April 24, 1997, nearly twelve years prior to the filing of the Amended Petition, Rule 15 dictates that amendment should be granted only if the amended claims relate back to the date of the original Petition.  <u>See</u> <u>Soler v. United States</u>, Nos. 10 Civ. 04342, 05 Cr. 00165, 2010 WL 5173858, *3 (S.D.N.Y. Dec. 20, 2010) ("[W]hen the statute of limitations has expired, Rule 15 dictates that amendments are only to be granted if they relate back under Fed. R. Civ.P. 15(c) to the date of the original proceeding.")

Rule 15 permits an amendment to relate back when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).  The central inquiry under Rule 15 is "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading."  <u>Stevelman v.</u> <u>Alias Research Inc.</u>, 174 F.3d 79, 86 (2d Cir.1999) (citations omitted).

Petitioner's original Petition alleges that his conviction was unconstitutional for the following reasons:  (1) the government unconstitutionally failed to disclose exculpatory and impeachment evidence to petitioner, primarily the

Scarpa/DeVecchio Information and the NYPD Reports; (2) the
government knowingly presented false testimony from Linda Mae
Kemble before the grand jury and at trial; (3) the government
knowingly presented false testimony from DeVecchio and vouched
for the perjured testimony in its closing argument; (4)
ineffective assistance of trial counsel, based upon his
counsel's failure to object to (a) jury selection being
conducted by the magistrate judge, (b) confusing jury
instructions, (c) introduction of the wiretap evidence, and (d)
the indictment on an improper theory of prosecution; (5)
ineffective assistance of appellate counsel; (6) Judge
Weinstein's imposition of a sentence that included a $2,000,000
fine and the costs of imprisonment without a proper finding of
Sessa's ability to pay was error; (7) the method for jury
selection in petitioner's trial violated the District's jury
selection plan and the Jury Selection Act as well as the
petitioner's rights to a fair cross-section and to equal
protection, to a fair jury trial, and to due process; and (8)
the jury instructions (a) were too confusing for the jury to
understand, (b) contained erroneous propositions of law and (c)
contained an instruction on the gun counts which violated
principles of law enunciated by the United States Supreme Court.
Petitioner also "[r]e-assert[d] and incorporate[d] by reference
. . .  all grounds raised in [his] pending Rule 33 motion,"

which are substantially similar to the grounds already included in his Petition. (Petition at 5.)

The Amended Petition asserts the following claims: (1) the government violated petitioner's right to due process of law by knowingly permitting DeVecchio to commit perjury during his testimony; (2) the convictions for loan sharking were in violation of the petitioner's due process rights because the proof adduced at trial failed to satisfy material elements of the offenses of loan sharking, namely, the names of specific borrowers and proof of violent activity; (3) the government knowingly and intentionally withheld evidence properly disclosable pursuant to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)("Brady") and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1973) ("Giglio"); (4) as Scarpa acted as a confidential informant, he was not petitioner's co-conspirator, and accordingly DeVecchio's testimony about the Colombo Family War improperly relied upon Scarpa's hearsay statements; (5) petitioner was denied due process of law and the court violated the grand jury clause of the constitution when it improperly amended the indictment for both the loansharking counts and racketeering counts; (6) the trial court improperly delegated its duty by having a magistrate judge conduct jury selection without petitioner's express consent; (7) petitioner's right of confrontation was abridged

when (a) the government failed to produce Scarpa as a witness and (b) Dr. Pearl testified regarding an autopsy report that was prepared not by him, but by Dr. Duong of the NY Medical Examiner's Office; and (8) the government bolstered and misrepresented the testimony of Linda Mae Kemble, a key government witness, during its closing argument.

The majority of the claims in the Amended Petition, including those regarding DeVecchio's perjury, the government's Brady violations, Scarpa's dual role as informant and coconspirator, the errors in jury selection, and Linda Mae Kemble's testimony, are identical or factually similar to the claims in the original Petition, and thus, their amendment is permitted. See Mayle v. Felix, 545 U.S. 644, 664, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) ("So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.") Likewise, petitioner's amended claim regarding the prosecution's failure to demonstrate any specific acts of loansharking is permitted. Although it was not specifically set forth in the original Petition, it is based upon the same core of operative facts as petitioner's original ineffective assistance of counsel argument, giving the government "fair notice of the claim[]." Freeman v. United States, Nos. 09 Civ. 4087, 02 Cr. 150, 2010 WL 4026067, *2 (Oct. 14, 2010) (citing Baldwin County Welcome

Center v. Brown, 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 80
L.Ed.2d 196 (1984)).  However, the Amended Petition contains two
claims that differ in both time and type from the claims in
original Petition: (1) the due process claim regarding the
improper amendment of the indictment; and (2) the confrontation
clause claim regarding Dr. Pearl's autopsy testimony.  Although
petitioner previously raised a confrontation clause claim
regarding Scarpa's testimony at his trial, his claim regarding
Dr. Pearl's testimony will not relate back merely because it is
premised upon the same category of constitutional violation.
Rather, the "claims added by amendment [must] arise from the
same core facts as the timely filed claims."  Desrosiers v.
Phillips, No. 05-CV-2941, 2008 WL 4469594, *6 (E.D.N.Y. Oct. 3,
2008).  See also Valerio v. Phillips, No. 02-CV-903, 2007 WL
4191817, at *5-6 (W.D.N.Y. Nov. 21, 2007) (holding that an
ineffective assistance claim premised upon the attorney's
conflict of interest and the failure to advise defendant of a
plea offer does not relate back to ineffective assistance claims
based upon allegations of deficient performance at trial).  As
an amended habeas petition will not relate back to the original
petition "when it asserts a new ground for relief supported by
facts that differ in both time and type from those the original
pleading set forth," Mayle, 545 U.S. at 650, petitioner may not
amend his Petition to set forth these claims.

VI.  Claims Common to Petitioner's Rule 33 Motion and Section
     2255 Petition

In his Petition, petitioner "[r]e-assert[s] and
incorporate[s] by reference as if expressly set forth herein all
grounds raised in my pending Rule 33 motion."  (Petition, at 5.)
Due to the similarity of the analysis required, and in the
interest of judicial economy, it is practical to consider the
claims asserted in both the Rule 33 Motion and Petition
together.  See, e.g., Orena, 956 F. Supp. at 1090-91.


A. Newly Discovered Evidence/Brady Violations

The Second Circuit has cautioned that a motion for a new
trial "based upon previously-undiscovered evidence is ordinarily
'not favored and should be granted only with great caution.'"
United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (quoting
United States v. Stofsky, 527 F.2d 237, 243 (2d Cir.1975)).  A
new trial "based on newly discovered evidence may be granted
'only upon a showing that the evidence could not with due
diligence have been discovered before or during trial, that the
evidence is material, not cumulative, and that admission of the
evidence would probably lead to an acquittal.'"  United States
v. Owen, 500 F.3d 83, 87 (2d Cir. 2007) (quoting United States
v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980)).

Petitioner contends that much of the newly discovered evidence should have been disclosed prior to trial. Pursuant to Brady, Giglio, and their progeny, the government is required to "disclose material information that is favorable to the accused, either because it is exculpatory, or because it is impeaching." United States v. Rodriguez, 496 F.3d 221, 225 (2d Cir. 2007) (internal quotation marks omitted). The **B**rady rule extends beyond information known by the prosecutor to encompass that information known by law enforcement officers working on behalf of the prosecution. See Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)(quoting Kyles v. Whitley, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995)) ("In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police'"). To warrant a new trial based upon a Brady violation, a defendant must demonstrate: "(1) that the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the 'evidence [was] suppressed by the State, either willfully or inadvertently'; and (3) 'prejudice . . . ensued.'" United States v. Paulino, 445 F.3d 211, 224 (2d Cir. 2006) (quoting Strickler, 527 U.S. at 281-82). To "satisfy the prejudice requirement, a petitioner must show a 'reasonable probability of

a different result' had the material been timely disclosed."
Ferranti v. United States, No. 05-CV-5222, 2010 WL 307445, at
*10 (E.D.N.Y. Jan. 26, 2010) (quoting Kyles, 514 U.S. at 434).

In assessing a Brady claim, "[e]vidence is not 'suppressed'
if the defendant either knew, or should have known, of the
essential facts permitting him to take advantage of any
exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618
(2d Cir. 1982) (citations omitted).  The government is not
required to disclose evidence to a defendant "who is 'on notice
of the essential facts which would enable him to call the
witness and thus take advantage of any exculpatory testimony
that he might furnish.'"  Id. (quoting United States v. Stewart,
513 F.2d 957, 600 (2d Cir. 1975)). "The rationale underlying
Brady is not to supply a defendant with all the evidence in the
Government's possession which might conceivably assist the
preparation of his defense, but to assure that the defendant
will not be denied access to exculpatory evidence only known to
the Government."  Id. at 619.


1. The New York City Police Department Reports

Among the evidence that petitioner claims was suppressed by
the government are the New York City Police Department reports
("NYPD Reports") completed after Coluccio's death.  Petitioner
contends that:

the government's conduct in misleading the Court and
the defendant in the face of specific defense requests
concerning the State investigation of the Coluccio
murder, the existence of other suspects in the State's
investigation and the State's uncovering of evidence
contrary to the government's theory that Mr. Sessa was
involved in Mr. Coluccio's murder . . . ought to
result in setting aside Mr. Sessa's conviction and
sentence.

(Rule 33 Motion, at 110.)  In response, the government asserts

that Brady and its progeny do not require the government to

disclose all investigatory work to the defense, the NYPD Reports

are neither material nor exculpatory, and petitioner, with

diligence, could have obtained the evidence before trial.

(Opposition to Rule 33 Motion ("Rule 33 Opp."), at 6-10.)

Initially, petitioner argues that "[t]he fingerprint

comparison results in the police reports reveal that there were

other specific suspects in the Coluccio homicide case, but even

more interesting, Greg Scarpa was mentioned as a subject; they

even checked his fingerprints" and accordingly, by not

disclosing the reports, the government failed to comply with its

Brady obligations.  (Rule 33 Motion, at 36.)  Petitioner is

correct that the NYPD initially investigated multiple suspects

for the Coluccio murder, including Scarpa, and that it performed

a fingerprint comparison on various suspects.  (Rule 33 Motion,

Ex. 4I-4K).  Petitioner fails to note, however, that each

suspect's fingerprints, including Greg Scarpa's, "compared

against the latent(s) . . . with NEGATIVE results."  (Id.)

Moreover, the reports indicate that the initial suspects were investigated several weeks after the murder merely because they were "associates of the deceased," not due to any specific suspicions on the part of the police. (Reply to Amended Petition, Ex. A.) As "[t]he government has no <u>Brady</u> obligation to 'communicate preliminary, challenged, or speculative information'" to a defendant, the government did not breach its <u>Brady</u> obligations by failing to disclose these NYPD reports. <u>United States v. Amiel</u>, 95 F.3d 135, 145 (2d Cir. 1996) (<u>quoting United States v. Diaz</u>, 922 F.2d 998, 1006 (2d Cir. 1990)). <u>See also</u> <u>Moore v. Illinois</u>, 408 U.S. 786, 795, 810, 92 S. Ct. 2562, 2575, 33 L. Ed. 2d 706 (1972) (noting that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case").

Petitioner further believes that the NYPD reports constitute <u>Brady</u> material because they contain witness statements that are exculpatory and could be used for impeachment purposes. (Amended Petition at 107.) However, none of these reports contain material exculpatory evidence, and any impeachment value from the reports is cumulative, and as such, a new trial based upon the government's nondisclosure is not warranted.

Several NYPD Reports contain witness statements detailing a time period for Coluccio's murder that is inconsistent with the timing given by Ambrosino at petitioner's trial. Although Ambrosino testified that he and petitioner met Coluccio at 8:00 p.m., and Coluccio's murder occurred shortly thereafter, (TT at 223:14-225:10), several witnesses mentioned seeing Coluccio at 8:40 p.m., 9:30 p.m. and 10:00 p.m., that evening. (Rule 33 Motion, Ex. 4A-4C.) However, while these witnesses provided statements regarding the timing of Coluccio's murder which conflict somewhat with the government's primary witness's testimony, they also conflict with the defense mounted by petitioner.

Petitioner's defense consisted of suggesting to the jury that Ambrosino, not petitioner, shot Coluccio, as revenge for insulting Ambrosino during the robbery of a jewelry store. (TT at 1353-54.) Moreover, petitioner attempted to cast doubt upon Ambrosino's testimony that petitioner shot Coluccio by intimating that petitioner was not even present at the Coluccio murder, and that Ambrosino placed him there to obtain a better plea bargain for himself. (TT at 709:25-712:18; 1350:3-1531:19.) In doing so, petitioner's trial counsel stated in closing:

> And let's talk about lying. The best lie is a lie
> that's built on fact. That's the best lie. If you
> and I are together in a situation and I know what that

situation is, but I don't want you to be harmed or I
don't want you to be included, because if I give you
up I don't get anything.

But if I substitute you for him and if giving you up
makes me or places me in a position where I can get a
break, it's easy.  I take whatever the facts are that
we did together and merely substitute you in there and
the outline is present, the facts are present.

Yes, Ambrosino knew what happened in that car with
Coluccio because he was there.  All he has to do is
substitute it.

(TT at 1350:3-15.)  As petitioner's defense consisted of the

theory that Ambrosino testified truthfully to the facts of the

murder, but fictitiously substituted petitioner into the murder

plot, any witness statements tending to contradict the time of

the murder also contradict petitioner's defense, and

accordingly, are not favorable to the defense for <u>Brady</u>

purposes.  <u>See</u> <u>United States v. Douglas</u>, 525 F.3d 225, 247 (2d

Cir. 2008) (holding that allegedly suppressed documents were not

exculpatory because the contents of the "documents were not

favorable to [defendant] for they were inconsistent with his

version of the events, and they provide no basis for finding any

reasonable probability that earlier disclosure of those

documents would have produced a different verdict").

Petitioner claims that several other NYPD Reports comprised

<u>Brady</u> material because they in some way contradict Ambrosino's

description of the events of May 16, 1989, beyond the timing of

Coluccio's murder.  Joseph Coluccio, the victim's brother,

stated to police officers that he was with Coluccio until 3:30
p.m., when Coluccio left to make his loanshark pick-ups, leaving
Joseph Kaplan at a McDonalds restaurant at 4th Avenue and 39th
Street in Brooklyn.  (Rule 33 Motion, Ex. 4D.)  However,
Ambrosino testified that Coluccio arrived at 13th Avenue and
69th Street with Sayegh and Billy at 3:00 p.m.  (TT at 222:23-
223:1; 223:11.)  As the locations are merely a few miles apart,[12]
the minor inconsistencies in timing are not sufficiently
material to raise a reasonable probability of a different result
had they been introduced at trial.  This is especially true
given the numerous statements in Joseph Coluccio's NYPD reports
that corroborate Ambrosino's testimony, namely that: (1)
Coluccio had developed a heroin habit seven to eight months
before his murder; (2) Coluccio "could not let it be known to
anyone in the business that he had a heroin habit;" (3) Coluccio
"used to hang out around 13th Avenue and 69th Street;" and (4)
Coluccio collected money for Carmine Sessa.  (Rule 33 Motion,
Ex. 4D; TT at 220-221).  See also United States v. Jackson, 345

_____

[12] The distance was calculated by reference to Google Maps.  *See*
http://maps.google.com/maps [last checked January 23, 2011].  A
court may take judicial notice of facts that are "capable of
accurate and ready determination by resort to sources whose
accuracy cannot reasonably be questioned." Fed.R.Evid. R.
201(b).  "Courts commonly use internet mapping tools to take
judicial notice of distance and geography."  Rindfleisch v.
Gentiva Health Systems, Inc., No. 10-CV-2111, 2010 WL 3980182,
at *11 n. 13 (E.D.N.Y. Oct. 8, 2010).

F.3d 59, 74-75 (2d Cir. 2003) (noting that given the compelling evidence against defendant, the minor inconsistencies between a witness's statement and an agent's report would not have led to a different result had the information been available at trial); Frias v. United States, Nos. 09 Civ. 2537, 01 Cr. 307, 2010 WL 3564866, at *7-8 (S.D.N.Y. Sep. 13, 2010) (holding that the government was not required by Brady to disclose an unavailable witness's statements, because even though they conflicted with the testimony of a government witness, they also corroborated much of the witness's testimony, and thus did not undermine the guilty verdict).

Similarly, the NYPD Report of Harry Ustler corroborates Ambrosino's testimony rather than contradicts it. Ustler stated that he noticed a vehicle parked in front of the side entrance to his residence on Kelly Boulevard at approximately 9:00 p.m. the evening of Coluccio's murder. (Rule 33 Motion, Ex. 4G.) He noticed a male walking up Kelly Boulevard towards McVeigh Ave, but lost sight of him. (Id.) Petitioner contends that Ustler's NYPD Report is Brady material that the government suppressed because it contradicted Ambrosino's testimony that both he and petitioner left Coluccio's car parked on the side on the road. However, although Ustler only saw one individual walking away from the vehicle, he noted that "it was a rainey [sic] night," and he lost sight of the individual before he reached the end of

66

the block at McVeigh Ave.  (Id.)  While petitioner believes it

is of note that Ustler did not report seeing Smurra's vehicle,

Ambrosino testified that Smurra parked a block away from

Coluccio's car, (see TT at 226), and accordingly, Ustler's

inability to see Smurra's vehicle corroborates Ambrosino's

testimony.  Therefore, Uslter's NYPD Report could not

"reasonably be taken to put the whole case in such a different

light as to undermine confidence in the verdict."  United States

v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003) (internal quotations

and citations omitted) (noting that the inconsistencies

contained in two documents were not so significant as to cause a

different result at trial).

Nor is a new trial warranted based upon the NYPD Reports'

potential impeachment value.  A "new trial is not required 'when

the suppressed impeachment evidence merely furnishes an

additional basis on which to impeach a witness whose credibility

has already been shown to be questionable.'"  United States v.

Wong, 78 F.3d 73, 79 (2d Cir. 1996) (emphasis in original)

(quoting United States v. Payne, 63 F.3d 1200, 1210 (2d Cir.

1995)).  At trial, Ambrosino was subjected to two days of cross-

examination, during which petitioner's counsel questioned him

about his: (1) involvement with organized crime; (2) fraudulent

use of credit cards; (3) loansharking; (4) participation in

robberies; (5) previous arrests for burglary, robbery, credit

card fraud, and perjury; (6) cooperation with the government's investigation of petitioner; (7) hopes for a reduced sentenced based upon his cooperation; (8) tax fraud; (9) occasional anger at petitioner; (10) gun possession; (11) previous incarceration for assault; (12) previous incarceration for perjury in 1975 or 1976; and (13) drug use. (See e.g., TT at 561:21-24, 567:18-19, 571:16-17, 573:4-7, 579:9-16, 581:11-20, 588:6 - 560:16, 603:6-10, 630:1-11, 650:10-20, 653:9 - 657:10, 696:3-24, 698 13-18, 770:5-6.) The cross-examination also included a detailed and thorough scrutiny of Ambrosino's account of Coluccio's murder, including the motivation therefor, his role therein, and many details concerning the time, place, and manner of the murder. (TT at 774-85.) Taking into account the already extensive cross-examination of Ambrosino, any additional impeachment material that petitioner may have been able to derive from the NYPD Reports would not have been likely to result a different outcome. See United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007) (holding that new evidence that a cooperating witness, before he cooperated, had taken steps to murder another witness in the trial was merely additional impeachment evidence and did not warrant a new trial). See also United States v. Nazario, 374 Fed. App'x 63, 66 (2d Cir. 2010) ("Because these notes do nothing to exculpate [defendant], and merely provide cumulative evidence that, at best, would have been useful in

further impeaching the government's witnesses, we find that the evidence had no reasonable chance of changing the outcome, and thus did not warrant a new trial.").  Therefore, the government did not improperly fail to disclose the NYPD Reports in violation of <u>Brady</u> and its progeny.

Even assuming, <u>arguendo</u>, that the NYPD reports contained favorable material evidence, petitioner nevertheless cannot demonstrate that the reports were unavailable to him before trial.  See <u>Payne</u>, 63 F.3d at 1208 (noting that "evidence is not considered to have been suppressed within the meaning of the <u>Brady</u> doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence") (alteration in original). Initially, many of the NYPD reports document statements by individuals known to petitioner before his trial.  Each person interviewed by the New York City police officers, other than Ustler, was either a friend or relative of Coluccio.  (<u>See</u> Rule 33 Motion, Ex. 4A-4G.)  As Imbriale noted at trial, petitioner knew how to contact Coluccio's wife, (<u>see</u> TT at 920), and thus, with the use of due diligence, petitioner could have discovered and interviewed the majority of the witnesses before trial.  <u>See</u> <u>United States v. Roth</u>, No. 01 CR. 401, 2003 WL 289615, at *3 (S.D.N.Y. Feb. 10, 2003) (denying defendant's motion for a new trial because defendant had "ample opportunity, both before and

during trial, to attempt to identify witnesses who might have information about the timing and circumstances" of the crime and could have uncovered the new evidence "before or during trial through the exercise of due diligence"). Furthermore, petitioner was aware of the NYPD Reports before trial. His counsel requested the reports, but the government indicated they were not Brady material and Judge Weinstein declined to order their disclosure. (Transcript of Pretrial Conference before Judge Weinstein, 92-CR-351, Oct. 9, 1992 ("Oct. 9 Tr.") at 81.) As petitioner's counsel knew of the NYPD Reports, his failure to obtain the them does not result in the evidence being either suppressed for Brady purposes or newly discovered for the purposes of Rule 33. See Knight v. Walsh, 524 F. Supp. 2d 255, 290 (W.D.N.Y. 2007) (holding that no Brady violation existed based upon the government's failure to disclose a videotaped interview where defendant knew that the interview occurred); United States v. Rigas, No. 02-CR-1236, 2007 WL 4145282, at *5 (S.D.N.Y. Nov. 20, 2007) (noting that courts have denied Rule 33 motions where defendant has failed to subpoena unwilling witnesses either before or during trial); United States v. Santos, No. 02 CR. 798, 2004 WL 63499, at *2 (S.D.N.Y. Jan. 14, 2004) (holding that defendant did not use due diligence in searching for evidence to corroborate his alibi where he decided before his trial that "a subpoena would be useless")(aff'd by

<u>United States v. Rodriguez</u>, 114 Fed. App'x 23 (2d Cir. 2004)).

Accordingly, petitioner does not merit a new trial, nor should

his conviction be vacated, based upon the government's

nondisclosure of the NYPD Reports, and his Rule 33 Motion and

Petition on this ground are denied.

### 2. The Scarpa/DeVecchio Information

Petitioner asserts that he is entitled to a new trial based

upon the government's nondisclosure of Scarpa's identity as a

confidential informant, which: (a) would have permitted

petitioner's counsel to argue that the Colombo Family war was

initiated by Scarpa and instigated by a fabricated attempt on

his life; (b) constitutes a violation of the government's <u>Brady</u>

obligations; (c) was material to a claim of entrapment; and (d)

undermines the confidence in petitioner's conviction, as four

subsequent trials in which Scarpa's role was disclosed resulted

in acquittals.  However, petitioner was sufficiently suspicious

about Scarpa's role as an informant and could have investigated

his suspicions to take advantage of this evidence.  In any

event, the introduction of the Scarpa/DeVecchio Information

would not have produced a different result at trial.

### a. The Scarpa/DeVecchio Information Was Not Suppressed

It is clear that at the time of petitioner's trial, the government knew of, and did not disclose, Scarpa's role as a confidential informant.  (See supra § III(D).)  But whether the government suppressed any evidence beyond that, including evidence of DeVecchio's misconduct, is a more complicated question.  The Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Kyles, 514 U.S. at 437.  Although the Court acknowledged that "police investigators sometimes fail to inform a prosecutor of all they know," id. at 438, courts have not addressed whether this duty should, and does, extend to evidence actively concealed from prosecutors.  In holding that the prosecutor's duty of disclosure extends to information in the hands of the police, the Supreme Court relied upon the fact that "'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'"  Id. at 438 (quoting Giglio, 450 U.S. at 154).  However, these procedures and regulations would not likely ensure the communication of information from a corrupt agent intent on concealing evidence of his own misconduct.  Nevertheless, as Judge Weinstein found while addressing an identical argument by another Colombo Family member, although the "prosecutors did not

72

personally know of DeVecchio's possible leaks to Scarpa and
harbored no suspicions about DeVecchio's conduct at the time of
the trials . . . , for <u>Brady</u> purposes, evidence related to this
information was 'suppressed' by the government," it is prudent
to attribute knowledge of the Scarpa/DeVecchio Information to
the prosecution in this instance as well. <u>Orena</u>, 956 F. Supp.
at 1095-96.

In opposition to petitioner's Rule 33 Motion and Petition,
the government argues that petitioner "has not shown that he was
unaware of [the Scarpa] information and could not have become
aware of it with the use of due diligence." (Rule 33 Opp. at
11.) Indeed, to merit a new trial based upon newly discovered
evidence, in addition to being material, the evidence must
actually "be newly discovered, i.e., discovered after
trial . . . [and] must be such that it could not, with due
diligence, have been discovered prior to or during trial."
<u>United States v. Paul Nosworthy</u>, 707 F. Supp. 2d 415, 418
(E.D.N.Y. 2010). Likewise, evidence is not considered
"suppressed" for <u>Brady</u> purposes where "defendant or his attorney
'either knew, or should have known, of the essential facts
permitting him to take advantage of [the] evidence." <u>United
States v. Jackson</u>, 6 F.3d 911, 918 (2d Cir. 1993) (quoting
<u>United States v. Leroy</u>, 687 F.2d 610, 618 (2d Cir. 1982.), <u>cert.
denied</u>, 459 U.S. 1174, 103 S.Ct. 823, 74 L. Ed. 2d 1019 (1983)).

While the evidence concerning DeVecchio's disclosures to Scarpa is new in the sense that it was discovered after petitioner's trial, (see supra § III(D)) petitioner has not demonstrated that, with diligence, he could not have discovered it earlier.

Petitioner argues that he requested, and the government suppressed, information about Scarpa before petitioner's trial. (Rule 33 Motion at 131-32.)  However, petitioner neither requested confirmation that Scarpa was an informant nor indicated why such disclosure was relevant to his defense. Instead, he merely asked for identification of the government's confidential sources, CS-3, CS-4, and CS-5.  (Oct. 9 Tr. at 81-82.)  Petitioner argues that "because CS-3 was just another name for Greg Scarpa," his request for information on CS-3 should have been construed as a request for information on Scarpa. However, the government "generally enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law,'" United States v. Jackson, 345 F.3d 59, 69 (2d Cir. 2003)(quoting Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L. Ed.2d 639 (1957)).

Moreover, petitioner was well aware of the rumors of Scarpa's cooperation, and with diligence, could have uncovered information about his law enforcement source.  At his trial, Ambrosino testified that petitioner called off a murder plot due to a New York Post article implicating Scarpa as an informant.

(TT at 265:13-266:5.)  As petitioner demonstrated concerns that

Scarpa was cooperating with law enforcement in 1991, the fact

that Scarpa was in fact an informant could have been discovered

by petitioner with due diligence.  See Rivas v. Fischer, No.

9:01-CV-1891, 2010 WL 1257938, at *10 (N.D.N.Y. Jan. 8, 2010)

(holding that evidence of a doctor's wrongdoing was not newly

discovered evidence due to newspaper coverage of his

investigation prior to petitioner's trial).  Moreover, the vast

majority of the evidence of DeVecchio's unauthorized disclosures

to Scarpa came from petitioner's brother, Carmine Sessa.  (See

Tomlinson Aff.; Sessa Interview.)  While Sessa was a fugitive

from arrest at the time of petitioner's trial, he nevertheless

remained in contact with his wife and other Colombo Family

members, and thus, with diligence, petitioner could have learned

about Scarpa's law enforcement source even before the

government.  (Sessa Interview, at 9; Rule 33 Motion, Ex. 12Z

(FBI Form 209, dated Aug. 16, 1992 (stating that Sessa was in

hiding and in contact with his wife and a member of his crew)).

See also United States v. Malpeso, 17 Fed App'x 23, 26 (2d Cir.

2001) (affirming the district court's holding that statements

from defendant's friend and girlfriend were not new evidence

because "an individual exercising due diligence would have

spoken to close friends or girlfriends at the time of a charged

crime to determine whether [a] defense was available"); United

States v. Roth, No. 01 CR. 401, 2003 WL 289615, at *4 (S.D.N.Y.
Feb. 10, 2003) (holding that defendant did not exercise due
diligence in obtaining the new evidence consisting of the
testimony of two witnesses because such witnesses "were uniquely
available to [defendant]-not the Government-before and during
trial") (aff'd by United States v. Greenfield, 75 Fed. App'x 813
(2d Cir. 2003).  Accordingly, as petitioner could have
discovered the Scarpa/DeVecchio Information with diligence
before trial, it does not constitute "newly discovered evidence"
or evidence suppressed by the government.

### b. Introduction of the Scarpa/DeVecchio Information at Trial Would Not Have Led to a Different Result

Petitioner argues that, had the government disclosed
Scarpa's role as an informant and his assistance from DeVecchio,
petitioner could have rebutted "the basic premises of the
government's case – i.e., that a 'war' even existed; that Scarpa
acted as a loyal member of the Persico faction; that Scarpa was
the first victim in the "war;" and that the government's
investigation and witnesses were untainted by misconduct."
(Rule 33 Motion, at 120.)  He also contends that the
Scarpa/DeVecchio Information would have permitted him to contest
the wiretap evidence from Ambrosino's vehicle, argue a claim of
entrapment, and object to the admission of Scarpa's hearsay
testimony.  However, even assuming, arguendo, that petitioner

could not have discovered the Scarpa/DeVecchio Information with diligence, for the following reasons, its introduction would not have led to a different result at trial.

     i. The Scarpa/DeVecchio Information was Neither Exculpatory Nor Material for Impeachment

  At petitioner's trial, the government presented evidence that the Colombo Family War was caused by an internal power struggle between the Orena and Persico Factions for control of the Colombo Family.  The government's witnesses identified Scarpa as a member of the Persico Faction who actively engaged in murders and attempts on behalf of his faction.  Petitioner contends that "[w]ith disclosure, the defense could have argued at trial that Scarpa drew from his 20-plus year relationship with the FBI, and the special protection he received from Lindley DeVecchio, to bring about the series of events characterized as the 'Colombo War.'"  (Rule 33 Motion, at 120.) In petitioner's version of the Colombo Family war, Scarpa seized upon the conflict brewing within the Colombo Family to create an atmosphere of fear and paranoia in which he could settle old scores against his enemies and enhance his position in the Colombo Family.  (Rule 33 Motion, at 119.)  This theory, petitioner argues, would have significantly undermined the government's account of the Colombo Family war, and likely have led to an acquittal on Count Five, charging participation in a

conspiracy to murder Orena Faction members in violation of 18
U.S.C. § 1959(a)(5).  (Rule 33 Motion at 119.)

Petitioner is not the first member of the Colombo Family to
make such an argument.  Joseph and Anthony Russo, Theodore
Persico Sr., Joseph Monteleone, Sr., and Larry Fiorenza
attempted to obtain a new trial before then-Chief Judge Sifton
based upon the Scarpa/DeVecchio Information.  See Persico, 1997
WL 8677888, at *26-33.  Likewise, Victor Orena and Pasquale
Amato raised a similar argument before Judge Weinstein in their
motions pursuant to Rule 33 and Section 2255.  See Orena, 956 F.
Supp. at 1096-1108.  Finally, Richard Brady, Frank Pontillo,
Michael De Matteo, and Robert Montano raised the same argument
before Judge Glasser.  See United States v. Brady, No. CR-92-
792, 1999 WL 438468, at *4-7 (E.D.N.Y. Apr. 30, 1999).  In each
case, the respective judges discredited the defendants' theories
of a Scarpa/DeVecchio driven war.

Judge Sifton noted that:

At the outset, the Court rejects defendants' proffered
theory that they could have persuaded the jury that,
given the shocking nature of the disclosures, that the
government was the primary proponent of the war or
that Scarpa's intimate involvement with the government
is by itself grounds for acquittal. The defendants
have no greater right on post-trial motion than they
do at trial to blunt the weight of the government's
evidence by the visceral impact of emotional arguments
or distraction of the jury from an examination of
their conduct to that of the prosecution. Cf. United
States v. Corallo, 413 F.2d 1306, 1321 (2d Cir.) ("As
the conspirators run for cover a favorite diversionary

tactic is to spread confusion by pursing digressions
suggested by proof having only a tangential bearing on
the case."), cert. denied, 396 U.S. 958 (1969). The
fact that jurors might have reacted irrationally to
the revelations does not undermine confidence in the
verdict.

Persico, 1997 WL 867788, at *29.[13]  Likewise, after noting

that accepting defendants' argument about a

Scarpa/DeVecchio created war "requires crossing the line

from rationality to paranoia," Judge Weinstein found that,

even assuming DeVecchio intentionally leaked information to

Scarpa:

and acknowledging the Scarpa-DeVecchio
connection's troubling coziness, does not warrant
the further inferences that Scarpa had a license
to kill bestowed upon him by DeVecchio, that he
committed the Ocera murder, that he initiated and
fueled a faux Colombo War to consolidate his
power, and that he did all this with DeVecchio's
authorization and assistance.

. . .

The notion that DeVecchio or the F.B.I. fomented
the Colombo War in a deliberate attempt to assist
the Persico faction, or even tainted the
investigation, flies in the face of the facts.
Had the jury been presented with such a claim, it
would have been shown by overwhelming evidence to
have been demonstrably false and an egregious
distortion of the record. As noted, the F.B.I.
and those agents DeVecchio supervised, as well as
others, went to great lengths to prevent violence
against either side in the War. . . .  As part of
its strategy to prevent hit teams from shooting
anyone, the F.B.I. focused on getting guns and

───────────────

[13] The Second Circuit reversed Persico in part on other grounds.
See U.S. v. Orena, 145 F.3d 551 (2d Cir. 1998).

shooters off the street. Thirty-five of the first
thirty-seven arrests were for firearms
possession. On a number of occasions, the F.B.I.
intervened to disrupt known Persico faction
attempts on the lives of Orena factionalists,
including defendant Amato. Of the 123 arrests of
Colombo Family members made during the War, sixty
of those arrested were Persicos. Prior to
Scarpa's arrest on August 31, 1992-the date up to
which any Scarpa-DeVecchio conspiracy could have
functioned-twenty-four of the fifty-four Colombos
arrested were Persicos. Since the Persico faction
was one-third the size of the Orena group,
proportionately many more of the Persico people
were prosecuted. These figures can not support a
charge of an imbalanced, tainted investigation
tilted in favor of Persico's henchmen.

Orena, 956 F. Supp. at 1101-04.  Finally, Judge Glasser disposed

of his defendants' argument in large part based upon Judge

Weinstein's analysis, and also noted that he:

> listened to the overwhelming evidence of guilt
> coming not only from the lips of the accomplice
> witnesses but from the electronically intercepted
> words that fell from the lips of the defendants
> themselves. Indeed, the overwhelming evidence of
> the guilt of the defendants which pervades
> virtually every page of the record would compel
> the conclusion that the claims upon which their
> motions are based are as "thin as the homeopathic
> soup that was made by boiling the shadow of a
> pigeon that has been starved to death," see
> Beamsley v. C.I.R., 205 F.2d 743, 748 (7th
> Cir.1953) (attributed to Abraham Lincoln) cited
> in Grosswald v. Schweiker, 653 F.2d 58, 61 (2d
> Cir.1981).

Brady, 1999 WL 438468, at *6.

Similarly, to accept petitioner's argument would require

ignoring the abundance of evidence presented at petitioner's

trial of his participation in the Colombo Family war.  Ambrosino

testified as to the existence of the war between the opposing

factions of the Colombo Family, and characterized it as a war

for control over the Colombo Family.  (TT at 247-52.)  Both

Ambrosino and Imbriale independently testified to petitioner's

position in the Colombo Family and his involvement in numerous

murder attempts on the Orena Faction.  (TT at 239-336, 923-30.)

Notably, Ambrosino spoke of petitioner's role in attempts upon

the lives of the acting boss, Orena, and the acting underboss,

Scopo, which occurred before Scarpa was even targeted or

involved in the war.  (See TT at 240-46.)  Likewise, the

electronic surveillance of Ambrosino's vehicle is replete with

references to petitioner's involvement in and direction of

others in the conspiracy to murder Orena faction members.  (See

Gov. Ex. 100.T-113.T.)  As petitioner's role in the conspiracy

was overwhelmingly established by the testimony and recordings

of his co-conspirators, the introduction of the Scarpa/DeVecchio

Information would not have undermined the government's case

against petitioner or negated an element of any charge against

him.  See Pri-har v. United States, 83 F. Supp.2d 393, 404

(S.D.N.Y. 2000) (holding that even had the government failed to

disclose information, "given the overwhelming evidence of

petitioner's guilt, . . . the outcome of his trial would not

have been different.")  Although petitioner attributes

substantial weight to the acquittals of four Colombo Family

members in trials where the Scarpa/DeVecchio Information was

disclosed, he overlooks the aforementioned substantial evidence

presented against him.  "The acquittals of some defendants in

other cases demonstrates the relative weakness of the evidence

against those defendants, rather than any mitigating force of

the Scarpa-DeVecchio information."  Persico, 164 F.3d at 805.

Nor would the introduction of the Scarpa/DeVecchio

information have been materially useful in the impeachment of

DeVecchio's testimony.  While DeVecchio briefly testified as to

the existence of the war, his testimony was predominantly

offered as expert testimony on the field of organized crime.

(TT at 85.)  Before allowing his testimony, Judge Weinstein

instructed the jury, in part:

> Don't assume that the defendant here, who is on trial,
> has anything to do with any of these organizations.
> Is that clear to all of you?  This is just background
> information.  It will help you, I believe, understand
> the other evidence before you and I will therefore
> allow it.  But this is a very serious charge that is
> made against this defendant and you have to rely upon
> credibility of witnesses who come before you who have
> more direct knowledge . . . .  These are general
> descriptions he has given.  They may or may not have
> any particular relevancy or cogency as far as this
> defendant is concerned.

(TT at 86.)  As Judge Weinstein instructed the jury that

DeVecchio's testimony was merely for background purposes, and as

DeVecchio's testimony about the war was corroborated by other

witnesses, evidence of his misconduct would not have led to a different result.  See Payne, 63 F.3d at 1210 (noting that "a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony'")(quoting United States v. Petrillo, 821 F.2d at 89)); United States v. Reyes, 49 F.3d 63, 68 (2d Cir. 1995) (holding that the district court did not err in concluding that evidence of a DEA agent's misconduct did not require a new trial, in part because the agent's "testimony was of marginal significance").  See also Orena, 956 F. Supp. at 1107 (noting that "[e]ven if DeVecchio was discredited and doubts were raised about the sloppiness of the investigation, these things would have had minimal effect on the outcome of the trial," because "DeVecchio's testimony was of little probative value" and "[e]vidence of the greatest probative value came from the cooperating witnesses . . .").


                    ii.  The Scarpa/DeVecchio Information was
                         Not Material to a Claim of Entrapment

     Insofar as petitioner contends that "[h]ad evidence not been withheld, counsel could have argued that Lindley DeVecchio knowingly permitted the FBI's coveted informant, Greg Scarpa, to act in such a manner that he directly persuaded and induced conduct on behalf of Michael Sessa and that the Government thereafter used such conduct to charge the defendant with

participation in the Colombo War," (Rule 33 Motion, at 150),
introduction of the Scarpa/DeVecchio Information would not have
permitted the conclusion that such inducement occurred.  "To
make out a defense of entrapment, a defendant must first prove
government inducement by a preponderance of the evidence. The
burden then shifts to the government to show that the defendant
was predisposed to commit the crime beyond a reasonable doubt."
United States v. Al-Moayad, 545 F.3d 139, 153 (2d Cir. 2008).
Petitioner argues that Scarpa fabricated the November 18, 1991
attempt on his life to "incite and perpetuate a war for his own
ulterior reasons," and "personally galvanized others to
retaliate and to support the violence that followed."  (Rule 33
Motion at 124-25.)  However, as previously noted, the government
presented evidence that petitioner engaged in war-related
violence before the attempt upon Scarpa, (see TT at 240-46), and
therefore, petitioner's theory of a Scarpa/DeVecchio created war
neither supports an inference of inducement nor negates evidence
of petitioner's propensity to engage in such violence.  See
Avedano v. United States, Nos. 08 Civ. 2549, 02 Cr. 1059, 2009
WL 137035, at *6 (S.D.N.Y. Jan. 21, 2009) (holding that
petitioner's speculations did not demonstrate government
inducement and he identified "no obvious weakness in the
Government's evidence that would undermine an inference that

Petitioner was predisposed to enter into the agreements for which he was convicted").

                              iii. The Scarpa/DeVecchio Information Would
                                    Not Have Permitted the Suppression of
                                    the Audio from Ambrosino's Vehicle

In his affidavit in support of the application to install listening devices in Ambrosino's vehicle, Agent Tomlinson swore that the confidential sources relied upon had previously proven reliable and were not known to give false information. (Rule 33 Motion at 128.) However, Petitioner argues that Tomlinson knew that Scarpa had provided false information concerning the murder of Grancio, and "[h]ad proper disclosures been made by the government . . . the defense could have successfully challenged the tapes on the basis that Agent Tomlinson employed deliberate falsehoods and reckless disregard for the truth in preparing the affidavit supporting the issuance of the wiretap order." (Rule 33 Motion, at 129).

A presumption of validity typically attaches to a law enforcement affidavit. <u>United States v. Falso</u>, 544 F.3d 110, 125 (2d Cir. 2008). In certain circumstances a defendant is entitled to a hearing to test the veracity of the affiant's statements, but before the defendant warrants such a hearing:

> [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.

> They should point out specifically the portion of the
> warrant affidavit that is claimed to be false; and
> they should be accompanied by a statement of
> supporting reasons. Affidavits or sworn or otherwise
> reliable statements of witnesses should be furnished,
> or their absence satisfactorily explained.

Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 57

L. Ed. 2d 667 (1978). See also Falso, 544 F.3d at 125

(noting that the "Fourth Amendment entitles a defendant to

a hearing if he or she makes a 'substantial preliminary

showing' that a deliberate falsehood or statement made with

reckless disregard for the truth was included in the

warrant affidavit and the statement was necessary to the

judge's finding of probable cause") (quoting Franks, 438

U.S. at 172).

Initially, petitioner fails to allege that any factual

details concerning the investigation or the need for a wiretap

were untrue.  The only misstatement petitioner alleges is

Tomlinson's conclusion that the confidential informant CS-3,

otherwise known as Scarpa, had proven reliable in the past.

Petitioner contends that Tomlinson deliberately made this false

statement to obtain the wiretap order, even though he was aware,

at the time he signed the affidavit, that Scarpa lied about the

identity of Grancio's murderer.  (Rule 33 Motion at 128.)

Petitioner points to Tomlinson's description in an affidavit of

Imbriale's debriefing to demonstrate Tomlinson's knowledge of

Scarpa's lie.  However, he fails to acknowledge that the affidavit indicates that Tomlinson neither knew for certain that Scarpa had lied nor found the identification of Scarpa as Grancio's murderer to "be a dilemma" until after Ambrosino corroborated Imbriale's statement.  (See Tomlinson Aff., at 9.) Ambrosino's arrest and debriefing occurred in June 1992, after the submission of the wiretap affidavit, and accordingly, any misstatement that Tomlinson made regarding Scarpa's reliability or veracity was merely an innocent mistake, and not grounds for a hearing attacking the wiretap order.  See United States v. Falso, 544 F.3d 110, 126 (noting that "[a]llegations of negligence or innocent mistake are insufficient" to warrant a hearing) (quoting Franks, 538 U.S. at 171); United States v. Carter, No. 07-5756, 2009 WL 765004, at *2 (2d Cir. Mar. 25, 2009 (affirming the denial of a Franks hearing where an officer had relied upon an informant later determined to be unreliable because defendant had made no preliminary showing of a deliberate falsehood).  As petitioner would not have even warranted a hearing contesting the wiretap, the introduction of the Scarpa/DeVecchio Information would not have produced a different result if introduced at trial for this purpose.

       iv.  The Scarpa/DeVecchio Information Would
            Not Have Led to the Exclusion of

87

Testimony Concerning Scarpa's Out-Of-
Court Statements

Petitioner argues that due to Scarpa's "symbiotic relationship" with the FBI, he "was not a bona fide co-conspirator within the meaning of Rule 801(d)(2)(E) and . . . as such, the hearsay statements attributable to Scarpa, and the significant inferences that were undoubtedly drawn therefrom, should have been excluded." (Rule 33 Motion at 145, 148.) Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that "[a] statement is not hearsay if [it] is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The Supreme Court has recognized the reliably of these statements, noting that because "they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court." United States v. Inadi, 475 U.S. 387, 395, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986). Moreover, because co-conspirator statements "are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence . . . , [their admission] actually furthers the 'Confrontation Clause's very mission' which is to 'advance the accuracy of the truth-determining process in criminal trials.'" Id. at 395-96 (quoting Tennessee v. Street, 471 U.S.

409, 415, 105 S. Ct. 2078, 2082, 85 L. Ed.2d 425 (1985)).

Courts typically apply this hearsay exception broadly, and have

permitted its application where the co-conspirator declarant is

a government informant. See United States v. Eisenberg, 596

F.2d 522, 527 (2d Cir. 1979) (noting that if declarants acted

"as Government informants throughout the alleged conspiracy,

their declarations could not be admitted on a theory of agency,"

but nevertheless admitted their statements because "although at

times they acted as informants in other matters, [they] did not

act as informers in the course of this conspiracy . . . but were

off on a frolic and detour for their own private profit");

United States v. DeSapio, 435 F.2d 272, 282-83 (2d Cir. 1970)

(permitting the introduction of a co-conspirator's statements

because he "was participating in the conspiracy, even though he

was currently reporting developments to the FBI and doubtless

did not expect to be prosecuted").

Petitioner contends that Scarpa "was exacting revenge,

eliminating rivals, acquiring monetary benefits, and

consolidating his power while he assisted the FBI in dismantling

the alleged 'Colombo Family,'" and accordingly, he was not

acting with a pure-co-conspiratorial purpose.  (Rule 33 Motion,

at 147.)  Petitioner's codefendants, Joseph Russo, Anthony

Russo, and Joseph Monteleone, Sr., have asserted this same

argument before Judge Sifton and on appeal before the Second

Circuit. In addressing the argument that the disclosure of the Scarpa/DeVecchio Information would have removed Scarpa's statements from Rule 801(d)(2)(E), Judge Sifton held that:

> the preponderance of the evidence indicates that
> Scarpa was engaged in this conspiracy as a bona fide
> co-conspirator, working with the defendants to depose
> Victor Orena. The evidence about Scarpa's involvement
> with the government suggests no more than that
> Scarpa's role as an informant was his frolic and
> detour; his principal endeavor was conspiring with the
> defendants. Even if De Vecchio became a tool of the
> conspiracy, that would not change the conclusion
> compelled by the evidence produced at trial and by
> Scarpa's indictment and guilty plea. Defendants
> themselves have listed the acts of violence committed
> by Scarpa in furtherance of the conspiracy and contend
> that he was the prime proponent and leader of their
> war. For the purposes of this evidentiary question,
> the court is amply satisfied that Scarpa's
> participation in the war places his statements within
> the co-conspirator exception.

Persico, 1997 WL 867788, at *26. In affirming Judge Sifton's conclusion, the Second Circuit noted that:

> Membership in a criminal conspiracy and rendering
> services to the government as an informant are
> not necessarily mutually exclusive roles. The
> status as a co-conspirator of one who is passing
> information to the government turns on whether
> his efforts as an agent of the government
> supplant his efforts as an agent of his co-
> conspirators. We draw a distinction between a co-
> conspirator who exchanges information with the
> government while still pursuing the conspiracy's
> criminal objectives, and one whose conduct as a
> "co-conspirator" is shaped and directed by the
> desires of the government. Scarpa falls squarely
> into the former category.

United States v. Monteleone, 257 F.3d 210, 221-22 (2d Cir. 2001). As the conspiracy analyzed by Judge Sifton and the

Second Circuit is the same as conspiracy at issue here, an
identical result is warranted.  Notably, petitioner's Amended
Petition, which post-dates the Second Circuit's opinion in
Monteleone, lacks any argument distinguishing Monteleone, (see
Amended Petition, at 109-118), and his argument that Scarpa was
not a co-conspirator is at odds with his argument that Scarpa
"engaged in most of the violence in [the] War."  (Amended
Petition, at 79.)  See also Monteleone, 357 F.3d at 222
(recognizing that "appellants' assertion that Scarpa was not a
member of the conspiracy is wholly at odds with the position
they took at trial").  Furthermore, insofar as petitioner argues
that "the use of Scarpa, Sr.'s testimony was a violation of the
Michael Sessa's right to confrontation under the Sixth
Amendment," (Amended Petition, at 132), the Supreme Court "has
indicated that statements in furtherance of a conspiracy are
non-testimonial for purposes of the Confrontation Clause, and
are therefore not covered by its protections."  United States v.
Shyne, 617 F.3d 103, 108 (2d Cir. 2010).  Therefore, as Scarpa's
statements were properly admitted as co-conspirator testimony
pursuant to Rule 801(d)(2)(E), they do not abridge petitioner's
right to confrontation as guaranteed by the Sixth Amendment.

3. Various Undisclosed Evidence

In his Petition, Amended Petition, and Rule 33 Motion, petitioner argues that numerous pieces of evidence, other than those relating to the NYPD Reports or the Scarpa/DeVecchio Information, were not disclosed to him prior to trial. This evidence includes, inter alia: (1) Ambrosino's and Imbriale's earlier dates of government cooperation; (2) Ambrosino's psychiatric report; (3) phone records demonstrating that a cellular telephone was not used by petitioner; and (4) the government's promise not to prosecute Carol Ariola in exchange for her testimony. However, the first three assertions derive solely from speculation on the part of petitioner and find no support in the record. See Mallet v. Miller, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (stating that "[i]t is well established that the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief"); United States v. Upton, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under [Brady] is not enough to establish that the government has, in fact, failed to honor its discovery obligations.") Moreover, his fourth ground is conclusively disproven by the record, and accordingly, does not warrant relief. (See TT at 732 (defense counsel acknowledging that he received the psychiatric report)).

B. The Government's Outrageous Conduct

Petitioner argues that "the government's conduct infringed upon those basic principals [sic] that are fundamental to our system of justice to such a degree that dismissal is warranted." (Rule 33 Motion, at 156.)  To "obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting [him]."  United States v. Cuervelo, 949 F.2d 559, 565 (2d Cir. 1991) (citing United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1642-43, 36 L. Ed. 2d 366 (1973)).  Unlike a claim of entrapment, the outrageousness of the government's conduct must be viewed without regard to the defendant's criminal disposition.  Cuervelo, 949 F.2d at 565. See also United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991) (noting that "the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience,' regardless of the extent to which it led the defendant to commit his crime") (quoting Rochin v. California, 342 U.S. 165, 172, 72 S. Ct. 205, 209, 96 L. Ed. 183 (1952)).  The defendant bears the "very heavy" burden of establishing such outrageous governmental

conduct, and such claims rarely succeed.  United States v.
Rahman, 189 F.3d 88, 131 (2d Cir. 1999).  See also United States
v. LaPorta, 46 F.3d 152, 160 (2d Cir. 1994).  In fact, "two
circuits have expressly repudiated the defense," United States
v. Bin Laden, No. 98 CR. 1023, 2001 WL 30061, at *7 (S.D.N.Y.
Jan. 2, 2001) (citing United States v. Boyd, 55 F.3d 239, 241
(7th Cir. 1995); United States v. Tucker, 28 F.3d 1420, 1424
(6th Cir. 1994)), and only two circuits have reversed
convictions based upon the defense.[14]

     In United States v. Lard, 734 F.2d 1290 (8th Cir. 1984),
two undercover agents embarked on a "drinking trip" with an
informant and defendant Rigsby.  During the course of the
evening, the agents indicated that they needed to buy guns, and
after unsuccessfully attempting to purchase a rifle from one of
Rigsby's acquaintances, the trio arrived at defendant Lard's
home to purchase a shotgun.  After Lard indicated his shotgun
was not for sale, Agent Anderson inquired as to whether Lard had
any other weapons, and Lard offered to sell him a detonator for
$100.  Anderson stated that the detonator was not strong enough,
and Lard offered him some shotgun shells to tape to the

--------

[14] Although the Ninth Circuit in Green v. United States, 454 F.2d
783 (9th Cir.1971), seemingly reversed a conviction based upon
outrageous government conduct, it later noted that Green "may be
an entrapment rather than an outrageous government conduct
case."  United States v. Haas, 141 F.3d 1181, 1998 WL 88550, *1
(9th Cir. 1998).

detonator to create a larger blast.  Anderson then stated that
he was really seeking a pipe bomb, but Lard hesitated and
indicated that he only wanted to sell the detonator and shells.
After Anderson offered $50 for the detonator, Lard agreed to
construct a pipe bomb for $100 within the next several hours.
The agents returned to Lard's house several hours later to
obtain the bomb, and at some point during the evening, smoked
marijuana with the defendants.  After the agents detonated the
pipe bomb, defendants were arrested, and after conviction, Lard
argued that his conviction should be reversed because he was
entrapped by Agent Anderson.  The Eighth Circuit held that:

> apart from the entrapment defense, Agent Anderson's
> overinvolvement in conceiving and contriving the
> crimes here approached being so outrageous that due
> process principles should bar the government from
> invoking judicial processes to obtain a conviction.
> Anderson's conduct was not aimed at facilitating
> discovery or suppression of ongoing illicit dealings
> in unregistered firearms. Rather, it was aimed at
> creating new crimes for the sake of bringing criminal
> charges against Lard, who, before being induced, was
> lawfully and peacefully minding his own affairs.  The
> government agents' overzealous efforts to instigate
> crime also involved rather extreme and questionable
> measures-including the smoking of marijuana-to gain
> Lard's confidence and lure him into committing a crime
> he was not otherwise ready and willing to commit.
> Concepts of fundamental fairness preclude us from
> putting our imprimatur on law enforcement overreaching
> conduct designed to instigate a criminal act by
> persons otherwise innocent in order to lure them to
> its commission and to punish them.

734 F.2d at 1296-97 (quotation marks and citations omitted)

In <u>United States v. Twigg</u>, 588 F.2d 373 (3d Cir. 1978),

another case reversing a conviction based upon the government's

outrageous conduct, a cooperating witness agreed to assist the

Drug Enforcement Agency in apprehending drug traffickers.  The

cooperating witness, Kubica, contacted an acquaintance, Neville,

to propose setting up a methamphetamine laboratory.  Over the

next several months, the two men made arrangements for the

laboratory, with Neville assuming responsibility for raising

capital and arranging distribution of the product, and Kubica

handling the selection of a manufacturing site and the

acquisition of equipment and materials.  Approximately five

months later, defendant Twigg joined the operation, primarily to

repay a debt owed to Neville.  Twigg initially accompanied

Kubica on several trips to supply houses, but thereafter

primarily ran errands for groceries and coffee until he was

arrested one week later.  In reversing his conviction due to

outrageous governmental conduct, the Third Circuit noted that:

> Twigg did not become involved in this criminal
> enterprise until March 1, 1977 the day the laboratory
> went into operation. His reason for becoming involved
> was to repay a debt owed to Neville. Neville
> introduced Twigg to Kubica, and then Twigg and Kubica
> went shopping for additional supplies, which Kubica
> purchased. There is no evidence to suggest that Twigg
> was aware of the ultimate purpose of these errands
> until informed by Kubica after returning to the
> farmhouse. All actions taken by Twigg from that time
> until his arrest were at the specific direction of
> Kubica, the government agent. Twigg contributed
> nothing in terms of expertise, money, supplies, or

ideas. It also appears that Twigg would not even have
shared in the proceeds from the sale of the drug. In
light of these facts, we hold that Twigg's conviction
is also tainted by the conduct of the DEA agents and
that fundamental fairness requires its reversal.

588 F.2d at 382.

The Second Circuit has "yet to identify a particular set of

circumstances in which government investigative conduct was so

egregious that it shocked the conscience and violated

fundamental guarantees of due process." <u>United States v.</u>

<u>Heyward</u>, No. 10 Cr. 84, 2010 WL 4484642, at *3 (S.D.N.Y. Nov. 9,

2010). In fact, the closest the Second Circuit has come to

reversing a conviction on this ground occurred in <u>United States</u>

<u>v. Cuervelo</u>, where it remanded for a hearing to determine the

outrageousness of the government's conduct. In <u>Cuervelo</u>, after

being convicted of conspiracy to import and distribute cocaine

and importing cocaine, defendant argued that the indictment

against her should be dismissed because an undercover agent

"initiated an intense sexual relationship [with her], and then

used the romance to persuade her to act as a go-between in a

cocaine deal." <u>Cuervelo</u>, 949 F.2d at 564. The Second Circuit

remanded the case to the district court for a hearing, and held

that:

[i]n addressing the question as to whether an
indictment must be dismissed based upon outrageous
governmental misconduct when a sexual relationship
between a defendant and a governmental agent has been
shown to exist, we believe that, at a minimum, the

97

> defendant must show: (1) that the government
> consciously set out to use sex as a weapon in its
> investigatory arsenal, or acquiesced in such conduct
> for its own purposes upon learning that such a
> relationship existed; (2) that the government agent
> initiated a sexual relationship, or allowed it to
> continue to exist, to achieve governmental ends; and
> (3) that the sexual relationship took place during or
> close to the period covered by the indictment and was
> entwined with the events charged therein.

Id. at 567. Thus, it is apparent that a successful due process challenge on the basis of outrageous government conduct in the investigation and prosecution of a case must include, at a minimum, intent on behalf of the government to engage in such conduct, and a substantial connection between the government's conduct and the criminal activity of which a defendant is both charged and convicted.

According to petitioner, the government's allegedly outrageous conduct permeated the entire investigation and prosecution of petitioner's case, and includes, inter alia, the government's knowledge of Scarpa's criminal activities, DeVecchio's disclosures to Scarpa, and the government's withholding of information from defense counsel.  (Rule 33 Motion, at 151.)  However, like his Brady argument, petitioner's claim of outrageous government conduct has been considered and rejected in his co-defendants' cases.  See Brady, 1999 WL 438468, at *4; Persico, 1997 WL 867788, at *18.

In evaluating the claim in _Persico_, Judge Sifton compared the government's conduct with regard to the Scarpa/DeVecchio Information to that in _United States v. DeSapio_, 435 F.2d 272, 281 (2d Cir.1970), _cert. denied_, 402 U.S. 999 (1971). In _DeSapio_, an FBI informant conspired with defendant to commit bribery and extortion. While the informant kept the FBI informed of the conspiracy's progress, the FBI neither authorized nor directed the informant to take part in the conspiracy, and declined to prevent the informant's participation because the informant was giving the FBI a tremendous amount of information. Refusing to reverse the defendant's conviction on this ground, the Second Circuit noted that:

> the FBI's conduct indeed went far beyond the familiar
> cases of the revenue agent approached with a corrupt
> proposal who, after reporting it to his superiors and
> on their instructions, acts out the drama which is
> closely surveilled and often wired for sound, or of
> the narcotics agent who plays an equivalent role in a
> pusher's home. In such instances, while the government
> participates in a transaction having the elements of a
> crime, it is one without adverse social consequences;
> there is no intention that the revenue agent will keep
> the bribe or that the narcotics agent will sell the
> narcotic. Here the FBI sat by while people extorted
> money to induce official action with knowledge that
> they planned to keep it for their own use. To be
> weighed against this, however, is the value of the
> information supplied by [the informant], revealing an
> extensive picture of corruption in high places, both
> in city government and in business, which had not

> theretofore been detected and very likely could not
> have been exposed in any other way . . . .  Where, as
> here, there is no claim that the informer's activity
> infringed any specific of the Bill of Rights or any
> statute of the United States relating to the conduct
> of investigations, and the competing considerations
> are such that we are unable to conclude that it
> violates the "decencies of civilized conduct," such
> decisions had best be left to the executive branch,
> which is accountable for its conduct to Congress.

435 F.2d at 281-82 (internal citations omitted).  Judge Sifton

noted that DeSapio indicated that in analyzing claims of

outrageous government conduct, a balancing test has arisen,

which weighs any "government improprieties against the

seriousness of the crimes under investigation, the difficulties

of preventing and detecting them by other means, the

availability of civil and disciplinary proceedings to correct

the misconduct that has occurred and all the surrounding

circumstances."  Persico, 1997 WL 867788, at 21.  Judge Sifton

then compared any government improprieties concerning the

Scarpa/DeVecchio Information and the resulting convictions to

prior caselaw:

> What the information developed reveals is a
> highly reprehensible trading of information
> between a law enforcement official and a criminal
> who a reasonable person would assume was
> continuing his criminal activities and using the
> information supplied for his own criminal ends.
> On the other side of the equation, however, was a
> complex multifaceted criminal organization
> engaged in a fratricidal war involving hundreds
> of individuals being betrayed by an apparently
> reliable source highly placed in the

100

organization. Looking more deeply into the situation adds to its complexity but produces no more clarity in terms of the rights and wrongs of the participants' behavior. Scarpa emerges as sinister and violent and at the same time manipulative and deceptive with everyone including DeVecchio. DeVecchio emerges as arrogant, stupid or easily manipulated but, at the same time, caught up in the complex and difficult task of trying to make the best use of Scarpa's information to bring the war to a close. In the end, one is left with the conclusion that this case involves the same serious errors of judgment on the part of law enforcement that were present in DeSapio, albeit involving far more serious crimes-both those tolerated and those under investigation. Here, as in DeSapio, administrative disciplinary proceedings and civil litigation in the form of lawsuits by the victims of Scarpa's shootings and their families are available remedies. This is not a case in which, like Twigg, defendants were "peacefully minding [their] own affairs." Nor is it one in which law enforcement officers "created" or manufactured" the crime with which these defendants are charged. United States v. Finley, 705 F.Supp. 1297, 1300 (N.D.Ill.1988). The criminal organization, defendants' membership in it, and defendants conduct of the affairs of that organization through a pattern of murders that characterized the Orena/Persico war all had their origins in decisions independent of any activity by DeVecchio and Scarpa and would have occurred without that activity. Defendants were not the victims of DeVecchio's horrendous errors of judgment; the families of those shot in the war were. No concept of due process, decency or civilized behavior requires that those convicted of being Scarpa's cohorts in the war should be immunized from prosecution because of the dire consequences of the Scarpa/DeVecchio connection for others.

Persico, 1997 WL 867788, at *21.

Judge Sifton's conclusion that the defendants' motion to dismiss the indictment on the basis of outrageous governmental conduct should be denied is equally applicable here where petitioner's claim is premised upon the same conduct.  Indeed, in Brady, also involving a claim of outrageous governmental conduct based upon the DeVecchio/Scarpa Information, Judge Glasser reached the same conclusion, noting that "[i]t would be both an affectation of research and analysis to replicate Chief Judge Sifton's discussion of the outrageous government conduct claim.  His conclusion that the motion to dismiss the indictment there must be denied and the reasons that compelled that conclusion are exquisitely applicable here."  Brady, 1999 WL 438468, at *4.  Moreover, any intervening caselaw between Judge Glasser's decision in Brady and the present only serves to strengthen this conclusion.  In 2000, in United States v. Candela, the Second Circuit held that the government's conduct was not so outrageous that it shocked the conscience after a defendant argued that the government's conduct justified dismissal of his indictment where a "government cooperator, in the course of his undercover cooperation, encouraged defendant and his cohorts to commit various crimes, including murders." United States v. Candela, 208 F.3d 204, 2000 WL 326411, at *2 (2d Cir. 2000).  The Second Circuit affirmed the district court's finding that none of the cooperator's recorded

statements could be construed as a threat or proposal of violence, and in any event, "a cooperator who spent more than two years recording the goings-on of a criminal crew might reasonably be expected to say things, during his interactions with other participants, that appear to condone criminal acts." Id. Accordingly, petitioner's motion to vacate his conviction and dismiss the indictment on the grounds of outrageous government conduct is denied.

VII. Section 2255 Claims

A. DeVecchio's Perjured Testimony

Petitioner argues that his conviction should be vacated because "the government knowingly put on perjured testimony on material subjects from prosecution witness DeVecchio and then emphasized and vouched for his perjured testimony in closing argument. A witness commits perjury if "he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." Monteleone, 257 F.3d at 219 (citations omitted). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury" required to vacate a conviction. Id. Petitioner contends that the government-suborned perjury included "DeVecchio's testimony that he never sought leniency

for an informant . . . [and] steps he would take if he encountered an informant who continued to commit crimes." (Petition, at 2.)  He further asserts that DeVecchio committed perjury when he identified Scarpa as a member of the Colombo Family aligned with the Persico faction, instead of "a member of the DeVecchio/Scarpa faction."  (Amended Petition, at 26.)

Whether the introduction of perjured testimony at trial constitutes a due process violation requiring the setting aside of a conviction depends upon "the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury" at the time of trial.  United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991).  If a petitioner can demonstrate that the prosecution knew or should have known of the perjury, the conviction must be vacated if "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Perkins v. LeFevre, 691 F.2d 616, 619 (2d Cir. 1982) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976)).  However, where the government was unaware of the perjury, the conviction must be set aside only "if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"  Wallach, 935 F.2d at 456 (quoting Sanders v. Sullivan, 863 F.2d 218, 225 (2d Cir.1988)).

Furthermore, "a defendant seeking relief on the ground of the government's use of perjured testimony must demonstrate that he was unaware, and with due diligence would have remained unaware, of the falsity of the testimony." Conteh v. United States, 226 F. Supp. 2d 514, 520 (S.D.N.Y. 2002). See also United States v. Zichettello, 208 F.3d 72, 102 (2d Cir.2000) (reversal based upon the use of perjured testimony is "not justified unless the appellant establishes four matters: (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial") (internal quotations and citations omitted).

At trial, petitioner's counsel attempted to elicit from DeVecchio the procedure that would be followed if one of his informants committed a violent crime. During this line of questioning, the following colloquy took place:

> Counsel:  Now if one of these informants who is a criminal out on the street committing crimes came up to you and said, I just robbed the Chase Manhattan Bank, would you arrest him?
>
> DeVecchio:    That would be reported, yes.
>
> Counsel:  I'm sorry?  I didn't hear the answer?
>
> DeVecchio:    I would not arrest him on the spot. That information would be of – of criminal nature would be reported, sure.  We don't allow – we don't

> condone criminal activities by informants any more
> than we do by anybody else.
>
> Counsel:  In other words, if an informant tells you I
> robbed a bank, I sold narcotics, I shot somebody you
> would seek to move either immediately or sometime very
> soon, I would presume, to arrest that individual, is
> that right?
>
> DeVecchio:     That information would be reported to –
> to the United States Attorney's Office for what action
> they deem appropriate after that.
>
> Counsel:  You wouldn't arrest him right on the spot?
>
> DeVecchio:     No, I would not.  Well, depending on
> the criminal nature of the activity.  But I would seek
> legal counsel from the United States Attorney's
> Office.

(TT at 116-117.)  Petitioner claims that, in light of the

evidence indicating that DeVecchio knew Scarpa was committing

violent crimes while acting as an informant, it is now apparent

that this testimony was perjured.  Additionally, petitioner's

counsel attempted to discern what, if any, leniency DeVecchio

sought for his informants:

> Counsel:  Do those rewards sometimes take the form of
> helping informants out of jams when, for example, an
> informant might get picked up by some other local law
> enforcement officer, brought in for questioning and
> the informant says, call up Agent DeVecchio.  I work
> for him.  Does the informant sometimes get a little
> help from the FBI, see if you can cut this fellow a
> break, he's a good informant for us?
>
> DeVecchio: No.
>
> Counsel:  You never did that?
>
> DeVecchio: If the informant choose—

106

Counsel:   Excuse me sir.  Did you ever do that?

DeVecchio: I have to qualify my answer by telling you
under what circumstances we would let the particular
agency know that it was an informant.  That would be
if the informant identified himself as an informant.
Our course of action then is to ask him whether he
wants – if he's identified himself, you want that fact
known, we advise them.  Beyond that, we don't offer
any suggestions or help as to how they might want to
prosecute that individual.

Counsel:  You've never told anybody, this is a very
valuable informant for us, he's in the middle of a
very intricate investigation, and it would really help
us out an awful low if you could see your way clear to
cutting him loose or letting him back out on the
street to help us?

DeVecchio: I've not done that.

(TT at 118-119.)  Yet, during the FBI Office of Professional

Responsibility's investigation into DeVecchio's misconduct, AUSA

Stamboulidis stated that after Scarpa was arrested for unlawful

possession of a weapon, DeVecchio advised him that "Scarpa was

more valuable on the street than in jail."  (Amended Petition at

29 (quoting FBI 302, Sep. 1, 1994, Interview with George

Stamboulidis, at 3.))  Accordingly, petitioner maintains that

these instances of perjury entitle him to the setting aside of

his conviction.

Even assuming the prosecution knew that DeVecchio testified

falsely, the questions of whether DeVecchio immediately arrested

informants who committed crimes, or aided them in obtaining

lenient sentences, were entirely immaterial to petitioner's

107

conviction. They neither negate the elements of the crimes of conviction nor diminish the abundance of evidence from other witnesses linking petitioner to the crimes. See United States v. Wong, 78 F.3d 73, 82 (2d Cir. 1996) (noting that "[t]he circumstances do not suggest that the undisclosed evidence of [the] perjury would have affected the result" because "[a]mple evidence supports [petitioner's] conviction [and] [t]he additional evidence concerns a collateral issue"); Roberts v. United States, No. 04-CV-1397, 2006 WL 3290188, at *3 (N.D.N.Y. Nov. 13, 2006) (noting that the purported perjury was not material as it did "not negate the essential elements of the crimes of conviction"); Sweat v. United States, No. 05-CV-221, 95-CR-232, 2005 WL 3179672, *6 (N.D.N.Y. Nov. 29, 2005) (noting that even assuming a witness lied during her testimony, "there was still a wealth of evidence upon which to convict Petitioner"). Cf. Ortega v. Duncan, 333 F.3d 102, 108-09 (2d Cir. 2003) (perjured eyewitness testimony identifying petitioner as the shooter was material to petitioner's conviction). Moreover, at most, the truthful testimony would have merely impeached a witness who served only to provide background information, (see TT at 86 (Judge Weinstein's instruction that DeVecchio's testimony was for background purposes)), and who was already subjected to extensive cross-examination. See Wong, 78 F.2d at 82 (noting that cumulative impeachment information "is

routinely held insufficient to warrant a new trial because it does not undermine the confidence in the verdict"); <u>United States v. Reyes</u>, 49 F.3d 63, 68 (2d Cir. 1995) (holding that a government agent's perjury did not warrant a new trial where the "testimony was of marginal significance" and the "core of the evidence" came from a different witness).  Therefore, these instances of perjury do not amount to a due process violation warranting the setting aside of petitioner's conviction.

Insofar as petitioner claims that DeVecchio perjured himself by identifying Scarpa as a member of the Colombo Family and Persico Faction, aside from petitioner's unsupported assertions and conspiracy theories, there is no evidence demonstrating that Scarpa was not a member of the Colombo Family aligned with the Persico Faction, and thus, no perjury occurred. <u>See</u> <u>Cunningham v. Bennett</u>, No. 02 CV 4635, 2005 WL 1162475, at *8 (E.D.N.Y. May 16, 2005) ("The petitioner has the burden of demonstrating, by a preponderance of evidence, that the witness committed perjury.)  (<u>See also</u> TT at 254:11-255:5 (Ambrosino identifying Scarpa as a member of the Persico Faction)).

Finally, insofar as petitioner argues that the prosecution improperly bolstered DeVecchio's testimony, "[b]olstering claims have been (expressly) held not to be cognizable on federal habeas review." <u>Diaz v. Greiner</u>, 110 F. Supp.2d 225, 234 (S.D.N.Y. 2000).  <u>See also</u> <u>Vega v. Berry</u>, 1991 WL 73847

(S.D.N.Y. April 29, 1991)("although bolstering is a practice
prohibited in various states, including New York, the practice
is not forbidden by the Federal Rules of Evidence and is not
sufficiently prejudicial to deprive a defendant of his due
process right to a fair trial").

    B. Linda Mae Kemble's Testimony

    Petitioner next asserts that his conviction should be
vacated because the prosecution misrepresented the testimony of
Linda Mae Kemble in its summation, by referencing information
gathered from her testimony during the Grand Jury proceedings
instead of information learned during her trial testimony.
(Amended Petition at 142.)  However, petitioner did not present
this claim upon direct appeal, and as he does not even attempt
to demonstrate either cause or actual prejudice for his failure
to do so, this claim is procedurally barred.  See United States
v. Canady, 126 F.3d 352, 359 (2d Cir. 1997) (The "failure of a
federal defendant to raise an issue on direct appeal will bar
the defendant from raising the issue for the first time in a
habeas petition unless the defendant can show cause and actual
prejudice.")(quotations omitted).  Nevertheless, his claim is
completely without merit.

    In order for a prosecutor's comments during summation to
amount to a constitutional violation, the comments must "so

infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1973). The Second Circuit has noted that "[p]rosecutorial misconduct during summation is grounds for reversal only when the remarks caused 'substantial prejudice' to the defendant." Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir.1991). See also United States v. Modica, 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), cert. denied, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982) (stating three-factor test for determining "substantial prejudice" from prosecutor's summation: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.")

During his summation, AUSA Weissman made several references to Ms. Kemble's testimony, reminding the jury that they heard from Ms. Kemble about "meetings in New Jersey" and "a series of meetings" between petitioner and Ambrosino, and that petitioner had been "transacting business" with Ambrosino for at least one year. (TT at 1280, 1287, 1301.) Although petitioner claims that these remarks were improper because "[t]here was, in fact no evidence presented that any meetings at all occurred in the restaurant,"(Amended Petition, at 145), his argument has no merit. At trial, Ms. Kemble testified to the following:

AUSA WEISSMANN: Did you see them come to your restaurant?

MS. KEMBLE: Yes, I did.

AUSA WEISSMANN: Were they together?

MS. KEMBLE: Yes, they were.

AUSA WEISSMANN: Did they come with other people?

MS. KEMBLE: Yes.

AUSA WEISSMANN: Over what period of time did you see these people?

MS. KEMBLE: About a year.

AUSA WEISSMANN: And approximately how often would they come in?

MS. KEMBLE: Maybe twice a month.

AUSA WEISSMANN: Did they come in with other men?

MS. KEMBLE: Yes.

AUSA WEISSMANN: Where did they go in the restaurant?

MS. KEMBLE: They went to the back of the restaurant; it's called the greenhouse.

AUSA WEISSMANN: What is that area used for?

MS. KEMBLE: When it's overflown [sic] or busy, a lot of our business people meet back there and they stay anywhere from a half hour to two hours, three hours.

AUSA WEISSMANN: These people that you've identified, approximately how long were they meeting there?

MS. KEMBLE: At least an hour or more then, maybe two.

AUSA WEISSMANN: Did you overhear anything that they were saying?

MS. KEMBLE: No.

(TT at 1139-40.)  Thus, as Ms. Kemble testified that petitioner

and Ambrosino sat in a section of the restaurant used for

business meetings, remained for over an hour, and returned

approximately two times per month for a year, it is

inconceivable how the characterization of these encounters as

"meetings" or "business," terms used by Ms. Kemble herself,

would substantially prejudice the petitioner.  See United States

v. Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989) (noting that

the prosecution has "broad latitude in the inferences it may

reasonably suggest to the jury during summation").  Moreover,

the fact that petitioner's counsel at trial failed to object to

the comments underscores that they were fundamentally not

unfair.  See, e.g., Malley v. Manson, 547 F.2d 25, 28 (2d

Cir.1976) (holding that when evaluating habeas corpus claims

alleging prosecutorial misconduct in summation, "absence of

contemporaneous objections or requests for cautionary

instructions are factors to be taken into consideration").  The

prosecutor's comments were entirely consistent with the

evidence, and therefore did not infect the trial with such

unfairness as to amount to a violation of due process.

C. Jury Selection

Before petitioner's trial, Judge Weinstein referred the supervision of jury selection to the undersigned, as, at that time, the United States Magistrate Judge assigned to petitioner's case. Petitioner contends that "having the Magistrate Judge conduct voir dire violated his right to due process, was a violation of the Magistrate Judge's Act (28 U.S.C. § 636), and was an improper delegation of Article III power to a non-Article III judge." (Amended Petition, at 126.) The Second Circuit rejected this argument upon direct appeal, and thus, petitioner is barred from bringing this argument here. See Yick Man Mui, 614 F.3d at 53.[15] Nevertheless, his claim is entirely without merit.

The Federal Magistrates Act permits district courts to assign magistrate judges certain identified duties, as well as "such additional duties as are not inconsistent with the Constitution and laws of the United States." 28 U.S.C.

_____

[15] Insofar petitioner argues his trial counsel was ineffective for failing to object to Judge Weinstein's delegation of jury selection to the undersigned as a Magistrate Judge, he fails to demonstrate how he was prejudiced by this failure. Moreover, the mandate rule bars "ineffective assistance claims in a Section 2255 proceeding when the factual predicates of those claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate." Yick Man Mui, 614 F.3d at 53. See also infra § VII(G) for a discussion of ineffective assistance of counsel claims.

§ 636(b)(3). In Gomez v. United States, the Supreme Court held that the "presiding at the selection of a jury in a felony trial without the defendant's consent" is not one of the additional duties that may be referred to a magistrate judge. Gomez v. United States, 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). However, one year later, the Supreme Court was faced with the question of whether the consent of the defendant brought jury selection within the realm of additional duties that may be assigned to a magistrate. See Peretz v. United States, 501 U.S. 923, 935, 111 S.Ct. 2661, 115 L.Ed.2d 808, 59 (1991). In Peretz, the Court noted that the defendant's consent significantly changed the constitutional analysis, and concluded that "the Act's 'additional duties' clause permits a magistrate to supervise jury selection in a felony trial provided the parties consent." Id. at 933. Such consent may come from defense counsel rather than defendant himself. See Gonzalez v. United States, 553 U.S. 242, 250, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008) (holding that "express consent by counsel suffices to permit a magistrate judge to preside over jury selection in a felony trial").

While petitioner acknowledges that his counsel consented to my supervision of jury selection at a time when I was a

Magistrate Judge,[16] he argues that as the Supreme Court did not

decide Gonzalez until sixteen years after his conviction, his

express consent, rather than his counsel's, was required.

(Amended Petition at 129 n.115.)  However, in Peretz, the

Supreme Court did not require that the defendant affirmatively

consent to the magistrate's supervision of jury selection.

Instead, it held that "a defendant has no constitutional right

to have an Article III judge preside at jury selection if the

defendant has raised no objection to the judge's absence.

Peretz, 501 U.S. at 936.  Indeed, in Peretz, the petitioner's

counsel, not petitioner himself, initially gave consent for the

magistrate to conduct jury selection.[17]  Id. at 925.

_____

[16] This court cannot locate the transcript of petitioner's
jury selection, and accordingly, it assumes that petitioner did
not personally voice his consent.  Indeed, petitioner confirms
this assumption in his Amended Petition by complaining that the
record does not demonstrate that he personally consented.
(Amended Petition, at 131.)

[17] The Court in Peretz summarized the proceedings as
follows:

> At a pretrial conference attended by both petitioner
> and his counsel, the District Judge asked if there was
> "[a]ny objection to picking the jury before a
> magistrate?" App. 2. Petitioner's counsel responded:
> "I would love the opportunity." Ibid. Immediately
> before the jury selection commenced, the Magistrate
> asked for, and received, assurances from counsel for
> petitioner and from counsel for his codefendant that
> she had their clients' consent to proceed with the
> jury selection.

Peretz, 501 U.S., at 925.

Furthermore, the Court in Gonzalez recognized that although "[a]t first reading it might seem that our holding here is dictated by the holding in Peretz," a different factual scenario, unrelated to the instant petitioner, required it to "address what . . . Peretz did not." Gonzalez, 553 U.S. at 246. The Court noted that "[i]n Peretz, it would appear the accused was aware of the colloquy between the District Judge and defense counsel and the formal waiver before the Magistrate Judge," but in Gonzalez, the petitioner required an interpreter, and the Court assumed that he "did not hear, or did not understand, the waiver discussions." Gonzalez, 553 U.S. at 246. Petitioner did not require the assistance of an interpreter at any point during his trial and was aware of his counsel's consent to the magistrate's supervision. Accordingly, he falls directly within the ambit of Peretz, and as he failed to object, he was not denied due process by the referral of jury selection to a Magistrate Judge. See Peretz, 501 U.S. at 933.

Insofar as petitioner contends that "[f]or some unknown reason, jurors in this case and in other cases tried in Brooklyn at the time of this case were not selected in accordance with the jury selection plan that had been duly adopted in this District," petitioner failed to bring this argument on direct appeal, and as he has not shown cause or prejudice, this claim is procedurally barred. See Canady, 126 F.3d at 359.

Nevertheless, petitioner fails to specify how his jury selection differed from the jury selection plan, or how such differences impacted his constitutional rights, and accordingly, this argument is without merit.

D. Improper Jury Instructions

Petitioner claims that "[t]he jury charge in this case was overly confusing and deprived the defendant of his constitutional rights to due process, to a fair jury trial, and to put forward his theory of defense and contained an erroneous proposition of law with respect to the gun counts." (Petition, at 5.)  The Second Circuit rejected this argument upon direct appeal, and thus, petitioner is barred from bringing this argument here.  See Yick Man Mui, 614 F.3d at 53.  Nevertheless, his claim is entirely without merit.

As the "Supporting Facts" for his argument, petitioner states that "as the Court itself appeared to recognize, the jury instructions that were given were too confusing for the jury to understand.  They also contained erroneous propositions of law, including the explanation of the elements of the gun counts. The instruction on the gun counts violated principles of law enunciated by the United States Supreme Court." (Petition, at 5.)  When the constitutional validity of a jury instruction is questioned in a collateral attack, the question is "whether the

ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned . . . ." Leecan v. Lopes, 893 F.2d 1434, 1443-44 (2d Cir. 1990) (quoting Henderson v. Kibbe, 431 U.S. 145, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977)) (internal citation and quotation marks omitted).

Insofar as petitioner claims that the jury instructions were too confusing for the jury to understand, his claim is too vague and speculative to succeed. Although Judge Weinstein recognized that the instructions were confusing, he worked extensively with petitioner's counsel and the government to prepare five drafts of the jury instructions. (TT at 1161-97.) Although some ambiguity may have escaped them, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004).

Insofar as petitioner contends that the instruction on the gun count was erroneous, he has failed to state why it was erroneous, and accordingly, his Petition on this ground is denied. See Hoover v. United States, No. 03-CR-6104, 2009 WL 1579529, at *2 (W.D.N.Y. Jun. 3, 2009) (dismissing a Section 2255 petition because petitioner failed to "identify the

particular jury instructions that he claims were deficient and
explain why they were deficient").


    E. Improper Sentence

    Petitioner claims that "[t]he Court's imposition of a
sentence that included a $2,000,000 fine and the costs of
imprisonment without a proper finding of [petitioner's] ability
to pay was error." (Petition, at 4.) However, petitioner did
not raise this claim on direct review, and as he fails to
provide any facts demonstrating cause or prejudice for his
failure to do so, his claim is procedurally barred.  See Massaro
v. United States, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d
714 (2003) (noting that the "general rule [is] that claims not
raised on direct appeal may not be raised on collateral review
unless the petitioner shows cause and prejudice").

    Regardless, his claim is without merit.  At petitioner's
sentencing, Judge Weinstein did not address the imposition of a
fine beyond stating that it is "what the law requires."
(Transcript of Proceedings, 92-CR-351, May 24, 1993, at 10.)
However, 18 U.S.C. § 3572(a)(1), which requires that a court,
before imposing a fine, consider, inter alia, the defendant's
income and earning capacity, "requires the court only to
'consider' these factors, and imposes no separate requirement
that this consideration be articulated."  United States v,

<u>Marquez</u>, 941 F.2d 60, 65 (2d Cir. 1991) (declining to require an "additional explanation for the fine imposed by the district court"). Moreover, Judge Weinstein only imposed fines authorized by the statutory maximum. <u>See</u> 18 U.S.C. § 3571(b)(3) (permitting a fine of not more than $250,000 for an individual who has been found guilty of a felony). Accordingly, the Petition to vacate petitioner's conviction on the grounds of an improper sentence is denied.

F. Elements of Loansharking

Petitioner argues that the "proof adduced at trial failed to satisfy a material element of the offenses of loan sharking under the applicable federal statutes, 18 U.S.C. §§ 892 & 894 and, and as such, the convictions for loan sharking were in violation of the petitioner's due process rights under the Fifth Amendment." (Amended Petition at 99). However, petitioner did not raise this claim on direct review, and as he fails to provide any facts demonstrating cause or prejudice for his failure to do so, his claim is procedurally barred. <u>See</u> <u>Canady</u>, 126 F.3d at 359. Regardless, petitioner's argument has no merit.

A petitioner challenging the sufficiency of the evidence must demonstrate that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998).

In evaluating the evidence, a court must consider "the evidence

in the light most favorable to the government," U.S. v. Payton,

159 F.3d 49, 56 (2d Cir. 1998), and "credit every inference that

could have been drawn in the government's favor." United States

v. Tejada, 956 F.2d 1256, 1265 (2d Cir.) (internal quotations

omitted), cert. denied, 506 U.S. 920, 113 S.Ct. 334, 121 L.Ed.2d

252 (1992). "These principles apply whether the evidence being

reviewed is direct or circumstantial." Gore, 154 F.3d at 40.

Petitioner was convicted of violating 18 U.S.C. § 892,

prohibiting the making of "any extortionate extension of

credit," or the conspiracy to do so, and 18 U.S.C. § 894,

prohibiting the knowing participation, or conspiracy to

participate, "in the use of any extortionate means: (1) to

collect or attempt to collect any extension of credit, or (2) to

punish any person for the nonrepayment thereof." He first

claims that the evidence presented at trial was insufficient

because it failed to identify specific borrowers of his

extortionate lines of credit. However, the record expressly

belies this argument. While testifying at trial, both Ambrosino

and Imbriale admitted that petitioner loaned them each $170,000

and $90,000 respectively, at interest rates from 1½% to 2% per

week. (TT at 207:21-208:8, 212:12-213:2; 911:2-913:1.)

Ambrosino further testified that petitioner made loans to Louis

"Ganoli" and Mike "the Arab," among others, and that he would collect the loans from them to deliver to petitioner.  (TT at 212-13.)

Petitioner next claims that evidence was insufficient because the government did not demonstrate any violent efforts to collect the loans, but this argument is likewise without merit.  Initially, the government did not need to prove that violent efforts were actually used to collect loansharking payments.  Instead, it merely needed to demonstrate "the use, <u>or an express or implicit threat of use</u>, of violence or other criminal means to cause harm to the person, reputation, or property of any person."  18 U.S.C. § 891(7) (defining the "extortionate means" that must be present for a violation of § 892 or § 894) (emphasis added).  Ambrosino and Imbriale both testified as to the threat and use of violence.  For instance, when discussing his loansharking customers, Ambrosino noted that "if they didn't pay for a few weeks, [he] would go after them, hit them."  (TT at 209:14-23.)  He also stated several times during cross-examination that the use of force was typical in the loansharking business:

> Counsel:   . . . you never shot anybody, did you, who owed you money?
>
> Ambrosino:    I did not.
>
> Counsel:  But you slapped them around?

123

Ambrosino:      Correct.

(TT at 565.)

    Counsel:  Did you ever slap them around in the back of
    the market?

    Ambrosino:      No.

    Counsel:  Did you ever slap them around in the street?

    Ambrosino:      Not as far as my legitimate business,
    as far as the produce business.  As far as my
    loanshark business, yes.

(TT at 605.)  Likewise, in the recordings made in Ambrosino's

vehicle and by Imbriale, the parties referred to the use or

threat of force on several occasions.  Ambrosino was heard

complaining that one of his customers was late with his payment.

However, he exclaimed that he was "not gonna crack the

guy . . . 'cause it's only a week.  What [he] wanted was to just

scare him a little bit."  (Gov. Ex. 110.T at 2-3.)  Similarly,

during his testimony, Imbriale was asked to explain a

conversation that he had recorded while cooperating with the

government.  The conversation concerned Todd Grossman, who had

borrowed $5,000 from Imbriale.  On the recording, Imbriale

mentioned that Grossman was "scared to death."  He explained:

    Imbriale: Todd wouldn't really get into details with
    me.  He was scared of Michael Sessa and when he went
    to pay off the money with Mike the Arab there.

    AUSA:     Did you at times, when people wouldn't pay
    you, did you hit them?

    Imbriale: Yes.

(TT at 945-46.)  The evidence thus established that
petitioner loaned money to Ambrosino and Imbriale, who
would, in turn, lend out the same money and collect the
proceeds under threat of force.  Accordingly, the evidence
presented at trial was sufficient to support petitioner's
loansharking convictions.  See United States v. Riggi, 541
F.3d 94, 109-10 (2d Cir. 2008) (noting that a cooperating
witnesses' statements that, inter alia, delinquent
loanshark customers would "wind[] up with a beating," and
fear that "the wise guys to whom he owed the money were
going to hurt or kill him," and that he would collect money
by using "[t]hreats of intimidation," were sufficient to
support a loansharking conviction).


        G. Ineffective Assistance of Trial Counsel

     Petitioner complains that he suffered from the ineffective
assistance of counsel at trial and sentencing.  The Sixth
Amendment provides, inter alia, that a criminal defendant "shall
enjoy the right . . . to have the Assistance of Counsel for his
defense." U.S. Const. amend. VI. To establish ineffective
assistance of counsel a petitioner must show that (1) "counsel's
representation fell below an objective standard of
reasonableness" and (2) counsel's representation was so

deficient that it "prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A court need not decide both prongs of the Strickland test if a party has made an insufficient showing on one. Id. at 697. To satisfy the "prejudice" prong of the Strickland test, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." Knowles v. Mirzayance, 129 S. Ct. 1411, 1422, 173 L. Ed. 2d 251 (2009) (quoting Strickland, 466 U.S. at 694). To prove a claim of ineffective assistance of counsel, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Knowles, 129 S.Ct. at 1420 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. at 2068). A petitioner may rebut this presumption only by demonstrating that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct at 2066.

### 1. Claims Belied by the Record

Petitioner contends that his counsel was ineffective for failing to object to the inclusion of the charge of conspiring to make extortionate extensions of credit as a predicate offence for the count charging conspiracy to engage in a pattern of racketeering. However, he cannot establish ineffective assistance on this point because this claim is expressly belied by the record. Judge Weinstein, defense counsel, and the government discussed the complications of this charge at length, and defense counsel, albeit unsuccessfully, made the court aware of his objection. (See TT at 1178-90.) In the Amended Sentencing Memorandum and Order, Judge Weinstein referenced counsel's objection, stating that "there are serious theoretical questions about the racketeering conspiracy count, based on a conspiracy to commit a conspiracy," but concluded that the charge was proper. United States v. Sessa, 821 F.Supp. 870, 875-76 (E.D.N.Y. 1993). Thus, petitioner cannot show his counsel was ineffective for failing to object to the charge where the record establishes that his objection was carefully considered by the trial court. See also Rosario-Dominguez v. United States, 353 F.Supp.2d 500, 515 (S.D.N.Y. 2005) (noting that petitioner could not establish ineffective assistance of counsel based upon his counsel's failure to challenge the court's calculation of drug quantity "because the record

demonstrates that at the sentencing hearing [counsel] did argue-albeit unsuccessfully-that the evidence did not support any attributable drug quantity determination above 865 grams").

Petitioner also argues that his counsel failed to properly investigate and impeach the government's witnesses.  He contends that had his counsel properly investigated the witnesses, he would have discovered impeachment materials, including, inter alia, the government's payments to Ambrosino, Ambrosino's earlier cooperation with the government, Ambrosino's admission to Imbriale that he killed a loanshark, and Imbriale's prior sexual assault charges.  (Petition at 3.)  However, contrary to petitioner's assertions, his counsel did question Ambrosino at length as to the payments he and his family received from the government, and how long he expected those payments to continue. (TT at 710-11.)  Likewise, counsel thoroughly examined Ambrosino regarding his decision to cooperate, inquiring whether he was in contact with the government and agreed to cooperate before his arrest (TT at 581, 593, 636-37, 644-46), or whether he and Imbriale, after reading a book about the witness protection program, had planned to cooperate with the government and enter the program, (TT at 627-28).  Counsel also asked Ambrosino whether he "ever [had] a conversation with Carmine Imbriale in which [Ambrosino] said to him that [Ambrosino] had killed a loanshark," and Ambrosino replied that he "might have discussed

with Carmine Imbriale about Andy Coluccio," but that he did not admit to committing the murder, just participating. (TT at 653.) Finally, counsel was well aware of Imbriale's prior sexual assault charges, and attempted to use them during his cross examination. However, Judge Weinstein prohibited their introduction after the government argued that they were not useful in assessing Imbriale's truth and veracity. (TT at 895-96.) Accordingly, petitioner's argument that his counsel was ineffective for failing to investigate and impeach these witnesses is without merit.

2. Counsel's Failure to Subpoena the NYPD Reports

Petitioner further argues that his counsel was ineffective for failing to subpoena the NYPD Reports "that were filled with exculpatory and impeachment materials." (Petition at 3.) Although petitioner did not bring this claim on appeal, the Supreme Court has held that the "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." Massaro v. United States, 538 U.S. 500, 509, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003). Accordingly, petitioner's claim may be considered.

As discussed above, at a pre-trial conference on October 9, 1992, the government declined to disclose the NYPD Reports,

believing that they did not constitute Brady materials.  (Oct. 9
Tr., at 78.)  At that time, defense counsel indicated that he
would subpoena the files pursuant to Rule 17(c) of the Federal
Rules of Criminal Procedure ("Rule 17(c)"),(Id. at 79), but
never did so.  However, his decision to not pursue a subpoena to
obtain the NYPD Reports was reasonable, as the NYPD Reports do
not constitute the type of material properly subject to a Rule
17(c) subpoena.

    "[A]ny document or other materials, admissible as evidence,
obtained by the Government by solicitation or voluntarily from
third persons is subject to subpoena."  Bowman Dairy Co. v.
United States, 341 U.S. 214, 221, 71 S. Ct. 675, 679, 95 L. Ed.
879 (1951).  However, a Rule 17(c) subpoena may not be used to
obtain evidence that is inadmissible at trial.  See United
States v. Cherry, 876 F. Supp. 547, 552 (S.D.N.Y. 1995) ("The
weight of authority holds that in order to be procurable by
means of a Rule 17(c) subpoena, materials must themselves be
admissible evidence.")  Moreover, "[c]ourts must be careful that
rule 17(c) is not turned into a broad discovery device, thereby
undercutting the strict limitation of discovery in criminal
cases found in Fed.R.Crim.P. 16."  Id.  Rule 16 of the Federal
Rules of Criminal Procedure ("Rule 16") provides for the
disclosure by the government of, inter alia, "the Defendant's
statements and criminal records, document and tangible objects,

reports of examinations and tests, and expert witnesses'

opinions." <u>United States. v. Ceballo</u>, No. 03-CR-283, 2003 WL

21961123, *1 (Aug. 18, 2003) (citing Fed. R. Crim. P.

16(a)(1)A)-(E)). Yet, Rule 16 explicitly states that it:

> does not authorize the discovery or inspection of
> reports, memoranda, or other internal government
> documents made by the attorney for the government or
> other government agents in connection with the
> investigation or prosecution of the case. Nor does
> this rule authorize the discovery or inspection of
> statements made by government witnesses or prospective
> government witnesses except as provided in 18 U.S.C.
> § 3500.

Fed. R. Crim. P. 16(a)(2).

Courts within this Circuit have held that a Rule 17(c)

subpoena may not be used to obtain reports and investigative

files from local law enforcement agencies in advance of trial,

both because it is prohibited by Rule 16(a)(2), and because such

evidence is generally inadmissible at trial. <u>See</u> <u>Ceballo</u>, 2003

WL 21961123 at *2-3 (quashing a Rule 17(c) subpoena seeking NYPD

investigatory files because their disclosure was barred by Rule

16(a)(2) and because "[i]nternal NYPD investigative files are

inadmissible hearsay"); <u>United States v. Jenkins</u>, No. 02 Cr.

1384(RCC), 2003 WL 1461477, *5 (S.D.N.Y. Mar. 21, 2003)(holding

that "Rule 16(a)(2) bars disclosure of reports generated by

local law enforcement agents, even when subpoenaed pursuant to

Rule 17(c)"); <u>Cherry</u>, 876 F.Supp. at 547 (granting motion to

quash subpoenas requesting disclosure of reports prepared by the

NYPD); United States v. Brown, No. 95 Cr. 168, 1995 WL 387698,

*10 (S.D.N.Y. June 30, 1995) (noting that "[s]uch [NYPD

interview] memoranda would, of course be hearsay and

inadmissible as evidence at trial").  Thus, had defense counsel

sought to subpoena the NYPD Records pursuant to Rule 17(c), he

would have been unsuccessful.  Accordingly, it was not

objectively unreasonable for defense counsel to decline to issue

a subpoena which would ultimately be quashed.  See e.g., Larcier

v. United States, No. 10 Civ. 3994, 2010 WL 4118100, *4

(S.D.N.Y. Oct. 19, 2010) (holding that counsel's decision not to

raise a meritless argument was reasonable).  Furthermore,

although having determined that counsel's actions were

reasonable, I need not reach the "prejudice" prong of the

Strickland analysis, it is worth noting that petitioner cannot

demonstrate "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have

been different."  Strickland, 466 U.S. at 694.  As previously

discussed, the disclosure of the NYPD Reports and their

introduction at trial would not have changed the result.  See

supra § VI(A)(1).


                3. Failure to Object to the Wiretap Evidence

        Petitioner further believes that his counsel unreasonably

conceded a lack of standing to object to the wiretap recordings

from Ambrosino's vehicle that were presented at trial. (Petition, at 4.) Although petitioner failed to bring this claim on direct appeal, as claims of ineffective assistance of counsel are more appropriately decided on collateral review, he is not procedurally barred from bringing the claim here. See Massaro, 538 U.S. at 509. His claim, however, is meritless.

"In order to have standing, a defendant must establish that he has a legitimate expectation of privacy that was violated by the Government's electronic surveillance." United States v. Rodriguez, No. 08 CR 1311, 2009 WL 2569116, at *4 (S.D.N.Y. Aug. 20, 2009). Pursuant to 18 U.S.C. § 2518(10)(a), only an "aggrieved person" may seek suppression of wire communications intercepted by the Government. 18 U.S.C. § 2518(10)(a). Section 2510(11) defines "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). However, the Second Circuit has clarified that this standard "is to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment." United States v. Gallo, 863 F.2d 185 (2d Cir. 1988), cert. denied, 489 U.S. 1083, 109 S. Ct. 1539, 103 L. Ed. 2d 843 (1989).

Petitioner concedes that his voice is not heard on the recordings, but he argues that because he was named as a target

in the wiretap application, he has standing to seek suppression.
(Petition at 4.)  However, a similar argument was presented to
the Second Circuit in United States v. Ruggiero, 928 F.2d 1289,
1303 (2d Cir.), cert. denied, 502 U.S. 938, 112 S.Ct. 372, 116
L.Ed.2d 324 (1991), where defendants, who were named as targets
of the surveillance, sought suppression of wiretap evidence.
The defendants argued that because the Circuit noted in Gallo
"that the complaining defendants in that case were 'not named as
targets of the surveillance,' 863 F.2d at 192, whereas
[defendants] were so named, Gallo somehow confers standing upon
[defendants] vis-a-vis [another individuals's] home and
telephone." Ruggiero, 928 F.2d at 1303 (quoting Gallo).
Rejecting their argument, the Second Circuit emphasized that
although Gallo mentioned the nontarget status of the defendants
in that case, it "did not invest that fact with any particular
significance, much less the decisive force for which
[defendants] contend." Ruggiero, 928 F.2d at 1303.  See also
United States v. Bynum, 513 F.2d 533, 535 (2d Cir. 1977)
(defendants who did not participate in the conversations in
question and did not have any interests in the premises where
the wire was placed did not have standing to contest the
admission of the wiretap evidence at trial).  Accordingly, it
was not unreasonable for defense counsel to concede a lack of

standing to object to the wiretap evidence, and the Petition
seeking relief upon this ground is denied.


H. Ineffective Assistance of Appellate Counsel

A criminal defendant has a right to the effective
assistance of counsel on the first appeal as of right.  Evitts
v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821
(1985).  Thus, the two-prong Strickland test also applies to
claims of ineffective assistance of appellate counsel.  See
Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) (citing Evitts
v. Lucey, 469 U.S. 387, 396-97 (1985)).  A petitioner may
establish constitutionally deficient assistance by showing that
his appellate counsel "omitted significant and obvious issues
while pursuing issues that were clearly and significantly
weaker."  Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000).
However, "[t]he failure to include a meritless argument does not
fall outside the wide range of professionally competent
assistance to which [a][p]etitioner [i]s entitled."  Aparicio,
269 F.3d at 99 (internal quotation marks and citations omitted).
Finally, even if an attorney's performance was objectively
unreasonable and unprofessional, the petitioner must still prove
that, "but for the deficiency, 'the result of the proceeding
would have been different.'"  Aparicio, 269 F.3d at 95 (quoting
Strickland, 466 U.S. at 694).

Petitioner contends that his appellate counsel was ineffective for "failing to raise the Court's inappropriate ethnic based comments at sentencing as the basis for a new sentencing proceeding before a different court (which also would have led to a different court for the [petitioner's] post-trial motions." (Petition at 4.) However, because "any arguments on this point would have been meritless, [p]etitioner's counsel cannot be held ineffective for failing to raise the claim." Frederick v. United States, No. 01 CV 7826, 2005 WL 2175904, at *7 (E.D.N.Y. Sep. 8, 2005). See also James v. Artus, No. 03 Civ. 7612, 2005 WL 859245, at *16 (S.D.N.Y. Apr. 15, 2005) ("counsel cannot be ineffective for failing to raise a meritless claim"); Carbajal v. United States, No. 99 Civ.1916, 2004 WL 2283658, at *6 (S.D.N.Y. Oct. 8, 2004) ("counsel did not render ineffective assistance by failing to raise this meritless claim").

At sentencing, Judge Weinstein stated that petitioner "must be sentenced for general deterrence because [he] believe[s] that there's a large part of the young Italo-American community who should be discouraged from going into this line of work." (Sentencing Tr., at 9.) Due to this comment, petitioner's first habeas counsel moved to disqualify Judge Weinstein and transfer the Petition to a different judge several years after the sentencing. However, Judge Weinstein, and later, Judge

Nickerson, denied petitioner's disqualification motion. (Tr. of
Hearing, Feb. 28, 1997, at 8 ("The Court has no prejudice. It
has never expressed any prejudice. . . . The information relied
upon based upon proceedings in this courtroom is not a basis for
a transfer of such a motion. The motion is denied.")) See also
United States v. Sessa, No. 92-CR-351, 1997 WL 177850 (E.D.N.Y.
Apr. 7, 1997) (denying petitioner's motion for disqualification
as untimely and because "no reasonable person in possession of
all the facts, including the full text of what Judge Weinstein
said, could reasonably question his impartiality").

Moreover, even if appellate counsel had acted unreasonably,
petitioner cannot demonstrate that the outcome "would have been
more favorable to petitioner, i.e., the error caused prejudice
to petitioner." Bolden v. Poole, No. 06-CV-6039, 2010 WL
5072129, at *19 (W.D.N.Y. Nov. 22, 2010). He states that he
desired "a different court for the [petitioner's] post-trial
motions." (Petition at 4.) When Judge Weinstein recused himself
on June 4, 2002, petitioner obtained exactly that. Accordingly,
as petitioner has demonstrated neither that his appellate
counsel's conduct fell below a standard of reasonableness nor
that he was prejudiced by such conduct, his Section 2255
Petition premised upon the ground of ineffective assistance of
appellate counsel is denied.

VIII.  The Requested Evidentiary Hearing

The court finds it unnecessary to conduct a hearing to resolve petitioner's claims.  Pursuant to Section 2255, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).  However "[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal."  Rule 4(b) of the Rules Governing Section 2255 Proceedings For the United States District Courts.

To warrant a hearing, the petitioner's "application must contain assertions of fact that [the] petitioner is in a position to establish by competent evidence." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987).  The court must then determine whether, viewing the record "in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief." Puglisi, 586 F.3d at 213.  If any material facts are in dispute, and petitioner can identify the available sources of the relevant evidence, petitioner's claims will warrant a

138

hearing.  Id. at 213-14 (noting that "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases . . .").  However, "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Aiello, 814 F.2d at 113-14.  Moreover, the court is not required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214.

Even if a court determines that a hearing may be warranted, the Supreme Court has held that such a conclusion does not "imply that a movant must always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be." Machibroda v. United States, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962).  Accordingly, a court may use methods "to expand the record without conducting a full-blown testimonial hearing." Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001)(citing Blackledge v. Allison, 431 U.S. 63, 81-82, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)).  A judge may, inter alia, rely upon his or her knowledge of the record, request that affidavits and other documentary evidence be submitted in lieu of a hearing, or, in the case of an ineffective assistance of counsel

claim, request that counsel respond to petitioner's claim. See e.g., Chang, 250 F.3d at 86 (holding that it is "within the district court's discretion to choose a middle road" method to expand the record, and that it was not unreasonable for the trial court to decline to hold a full evidentiary hearing where it requested submissions from the parties). This method of expanding the record serves to avoid "the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would [result] from a full testimonial hearing." Chang, 250 F.3d at 86. However, while a "district court has wide discretion in developing the record it will use to determine a habeas petition, that discretion does not extend to summary dismissals of petitions presenting facially valid claims . . . ." Pham, 317 F.3d at 185.

The issues raised in this Petition warrant a "middle road" approach, analyzing the bulk of petitioner's claims using his trial record, earlier proceedings within his case, and materials used by the parties in the preparation of their submissions. See Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003) (noting that "[a]mong the wealth of materials available to the district court at its direction are the trial record, letters, documents, exhibits, affidavits and written interrogatories")

(citing Fed. R. Governing Section 2255 Proceedings 4, 7). The remainder of petitioner's claims, though not based upon facts found in the record, nevertheless do not require a hearing.

Petitioner has provided a list of twenty-six facts that he wishes to prove at a hearing, a representative sampling of which include: "DeVecchio and Scarpa, Sr. blamed Petitioner for other crimes that they knew petitioner was innocent of," "DeVecchio was receiving money and gifts from Scarpa, Sr.," and that "four pieces of evidence that were involved in the alleged Scarpa shooting that re-ignited the so-called war went missing in the N.Y.C. and F.B.I. evidence rooms." Not only are such claims irrelevant to the constitutionality of petitioner's conviction, but he also fails to identify a competent source of evidence substantiating them, or even to state such a source is available to him. See Boakye v. United States, No. 09 Civ. 8217, 2010 WL 1645055, at *6 (S.D.N.Y. Apr. 22, 2010) ("To obtain an evidentiary hearing, Petitioner must . . . set forth in an affidavit specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief."); Petrucelli v. United States, Nos. 05 Civ. 9582(TPG), 02 Cr. 099(TPG), 2009 WL 4858081, at *13 n.1 (S.D.N.Y. Dec. 15., 2009)(noting that "[t]o warrant an evidentiary hearing, a habeas petitioner must raise detailed and controverted issues of fact supported by

competent evidence").  See also United States v. Jordan, 591
F.Supp.2d 686, 711 (S.D.N.Y. 2008) ("[A]n evidentiary hearing is
not held to afford a convicted defendant the opportunity to
conduct a fishing expedition.")(quoting United States v.
Stewart, 433 F.3d 273, 306 (2d Cir.2006)).  Moreover, that
petitioner's clearly questionable contentions are set forth only
in an unsworn letter "supports a finding that [his] statement
cannot be credited" and permits the court to "make a finding
regarding [petitioner's] factual assertions without a hearing".
 Colon v. United States, 2010 WL 1644260, *5-6 (S.D.N.Y. April
21, 2010).  See also Paulino v. United States, 476 F.Supp.2d
395, 397 (S.D.N.Y. 2007) (finding petitioner's unsworn
recitation of facts and assertions in his petition and
memorandum of law were neither sufficiently reliable nor
credible to warrant a hearing); Pimentel v. United States, Nos.
96 Civ. 5891(JFK), 91 CR. 83(JFK), 1998 WL 50142, at *7
(S.D.N.Y. Feb, 9, 1998) (concluding that there was "no need for
a hearing because [petitioner] failed to support his petition
with any affidavit or affirmation from anyone with personal
knowledge on this case").  As petitioner has failed to assert
plausible claims or identify legitimately disputed issues of
fact, and because his claims may be evaluated by using his trial
record and other submissions of the parties to this proceeding,
a hearing on his petition is not required.  See Benoit v. United

States, No. 08-CV-04941, 2010 WL 3925201, at *5 (E.D.N.Y. Feb 25, 2010), adopted by 2010 WL 3924736 (E.D.N.Y. Sep 29, 2010) (noting that "[a] hearing is warranted where the petitioner establishes that his claim is plausible").

IX. Petitioner's Motion to Remove Counsel and Appoint Substitute Counsel

On August 2, 2010, petitioner filed a motion to remove Bernard V. Kleinman, Esq., his counsel of record, and appoint new counsel due to Kleinman's "continuous pattern of neglect and incompetence." (Pet. Mot. To Remove Counsel, at 2.) In January 2004, Kleinman was appointed as CJA Counsel to represent petitioner in both his habeas case and his underlying criminal case. Although the Criminal Justice Act's "primary focus is on providing adequate counsel for trials on substantive offenses," United States v. Miranda, 455 F.2d 402, 404 (1972), it also permits the appointment of counsel in Section 2255 proceedings when "the interests of justice so require." 18 U.S.C. § 3006A(a)(1)(B). If an evidentiary hearing in a Section 2255 proceeding is warranted, "the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed." See 28 U.S.C. § 2255(g); Fed. R. Governing Section 2255 Proceedings, 8(c). However, the Supreme Court has "never held that prisoners have a constitutional right to counsel when

143

mounting collateral attacks upon their convictions."
Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 95
L.Ed.2d 539 (1987).  See also Chalk v. Kuhlmann, 311 F.3d 525,
528 (2d Cir.2002)(citing Ross v. Moffitt, 417 U.S. 600, 610-11,
94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), Wainwright v. Torna, 455
U.S. 586, 587-88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982), and
Coleman v. Thompson, 501 U.S. 722, 756-57, 111 S.Ct. 2546, 115
L.Ed.2d 640 (1991)(noting that the Supreme Court has stated that
"the right to counsel extends only to a first appeal as of
right").  Thus, the Second Circuit and the Rules Governing
Section 2255 Proceedings do not mandate the appointment of
counsel in those habeas proceedings not requiring an evidentiary
hearing.  See Bailey v. Ercole, No. 06-CV-2129, 2007 WL 4565034,
*1-2 (E.D.N.Y. Dec. 21, 2007).

When Judge Weinstein initially ordered that CJA counsel be
appointed on June 13, 2002, an evidentiary hearing was scheduled
for two weeks later.  (Habeas Docket Nos. 12, 21, 23).  Although
the hearing was canceled upon the reassignment of the case to
Judge Trager, the CJA appointment stood.  (Habeas Docket Nos.
29, 32, 34.)  However, as petitioner's contentions have no
merit, (see §§ VI-VII), and do not warrant an evidentiary
hearing, (see § VIII), the interests of justice do not
necessitate the appointment of CJA counsel.  See Jackson v.
Conway, No. 05-CV-0571, 2008 WL 850326, at *2 (W.D.N.Y. Mar. 28,

2008) (denying the appointment of counsel because an evidentiary hearing was not required).  Even his criminal case has proceeded past the initial appeal, rendering a CJA appointment unnecessary.  See United States v. Birrell, 482 F.2d 890, 892 (2d Cir. 1973)(holding that criminal defendants do not have a right to counsel for post-appeal Rule 33 motions for a new trial).  Nevertheless, assuming arguendo, that petitioner is entitled to CJA counsel, he has not made the showing necessary to remove one CJA counsel and substitute another.

The "judicial officer may, in the interests of justice, substitute one appointed counsel for another."  Revised Plan of the United States District Court for the Eastern District of New York Pursuant to the Criminal Justice Act of 1964 ("CJA Plan") § V(A).  However, a defendant who is dissatisfied with his assigned attorney must "demonstrate 'good cause' for the court to assign different counsel," Ballard v. Walker, 772 F. Supp. 1335, 1339 (E.D.N.Y. 1991), and such defendant does not have the right to select substitute counsel of his choice.  CJA Plan § V(A).  See also United States v. Gonzalez-Lopez, 548 U.S. 140, 151, 126 S.Ct. 2557, 2565, 165 L.Ed.2d 409 (2006) (noting that the right to counsel of one's choice "does not extend to defendants who require counsel to be appointed for them").  Good cause for substitution may include a conflict of interest, see Ennis v. LeFevre, 424 F.Supp. 14, 16 (E.D.N.Y. 1976), or a

complete breakdown in communication between counsel and his client, see Felder v. Goord, 564 F.Supp.2d 201, 220 (S.D.N.Y. 2008), but it is not to be assessed merely "according to the subjective standard of what the defendant perceives." McKee v. Harris, 649 F.2d 927, 932 (2d Cir. 1981)

Although petitioner maintains that Kleinman refuses to communicate with petitioner or his family, or devote any efforts to his case, the docket is replete with evidence that Kleinman has devoted time and effort to petitioner's case. (See Habeas Docket Nos. 73 (Reply in Support of Motion for Writ of Mandamus to Appoint Special Prosecutor), 74 (Fifty-three (53) page Reply in Support of Petition with numerous exhibits) and 75 (Letter re: Ordered Evidentiary Hearing).) Thus, his contention that Kleinman lacks dedication to his case does not demonstrate good cause for removal. See Greene v. Brown, No. 06 Civ. 5532, 2007 WL 1589449, at *17 (S.D.N.Y. Jun. 4, 2007)(concluding that a defendant's "initial reason for requesting new counsel-that his attorney was paying insufficient attention to his case" did not constitute good cause for substitution of counsel). Likewise, petitioner's claim that "Kleinman is looking to sabotage the Petitioner's § 2255 process" by purportedly giving weight to the misstatements made by the government in its submissions, (Pet. Mot. To Remove Counsel, at 5) actually complains about counsel's tactical strategy for strengthening an argument, and therefore,

does not constitute good cause for substitution of counsel.  See
United States v. Kopp, No. 00-CR-189A, 2007 WL 1747165, at *4
(W.D.N.Y Jun. 18, 2007)(holding that "a difference of opinion
regarding strategy" between defendant and his counsel did not
warrant substitution of counsel).  Instead of trying to
"sabotage the Petitioner's § 2255 process", Kleinman addressed
and exhausted any possible remaining claims that had not yet
been litigated in cases concerning the Scarpa/DeVecchio
information.  Finally, insofar as petitioner contends that
Kleinman's representation of another individual in a contract
dispute constitutes a conflict of interest, Judge Trager
previously denied his request to remove Kleinman on this ground,
(see Habeas Docket No. 61), and petitioner has not alleged any
facts that would tend to cast doubt upon that decision.
Accordingly, petitioner's motion to remove counsel and appoint
substitute counsel is denied.

   X.   Petitioner's Motion to Appoint a Special Prosecutor

        Finally, petitioner has moved, pursuant to 28 U.S.C.
§ 1361, for a writ of mandamus "directing the Attorney General
of the United States to appoint a Special Prosecutor under the
authority vested in him pursuant to 28 U.S.C. §§ 510, 515(a)"
because "some of the same parties involved in the prosecution of
the Petitioner are still in the U.S. Attorney's Office for the

Eastern District of New York, and . . . the New York Office of the F.B.I." (Aff. Of Bernard V. Kleinman, Esq., at 6.)  While petitioner surely desired to have his motion addressed before the determination of his Section 2255 claims, his arguments are patently meritless and did not warrant earlier discussion.

The issuance of a writ of mandamus "is a drastic remedy," Morelli v. Alexander, 920 F. Supp. 556, 558 (S.D.N.Y.1996), which may be obtained "only when the plaintiff has a clear right to the relief sought, the defendant has a clear duty to perform, and no other adequate remedy is available.," Hussein v. Ashcroft, No. 01-CV-1239, 2002 WL 31027604, at *3 (E.D.N.Y. Sep.12, 2002) However, mandamus is not available to compel an official to perform a purely discretionary act.  Pieczenik v. Cambridge Antibody Tech. Group, No. 03 CIV. 6336, 2004 WL 1118500, at *6 n.76 (S.D.N.Y. May 14, 2004)(noting that there exists no basis for mandamus jurisdiction to compel an official to perform a discretionary act).

Pursuant to 28 U.S.C. § 515(a):

The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

28 U.S.C. § 515(a).[18]  See also United States v. Nixon, 418

U.S. 683, 694-696, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)

(noting that "the Attorney General [had] delegated the

authority to represent the United States in [that]

particular matter[] to a Special Prosecutor with unique

authority and tenure").

Although petitioner makes several attempts to distinguish

his request from one that impermissibly seeks to compel a

discretionary function, he nevertheless requests that this court

direct the Attorney General to appoint a special prosecutor,

which is a matter within the Attorney General's sole discretion.

See United States v. Wrigley, 520 F.2d 362, 369 (8th Cir. 1975)

("The decision as to when special attorneys [are] to be

employed, however, [is] left solely to the discretion of the

Attorney General."); United States v. Finazzo, 407 F.Supp. 1127,

1132 (E.D. Mich. 1975)(same).  As the determination whether to

act pursuant to 28 U.S.C. § 515(a) is within the Attorney

General's discretion, I may not properly issue a writ of

mandamus compelling him to do so.  Elliott v. Holder, No. 09-

1544, 2009 WL 2525160, at *1 (D.D.C. Aug. 17, 2009)(denying a

petition for a writ of mandamus compelling the Attorney General

---

[18] 28 U.S.C. § 510 permits the Attorney General to delegate
his authority under, inter alia, 28 U.S.C. § 515, to "any other
officer, employee, or agency of the Department of Justice."  28
U.S.C. § 510.

to appoint a special prosecutor because it is a discretionary act).  See also Matter of Application For Appointment of Independent Counsel, 596 F.Supp. 1465, 1470-72 (E.D.N.Y. 1984) (concluding that the constitutional separation of powers between the executive and the judicial branches, as well as the broad discretion traditionally vested in the prosecutor, prohibited the court from interfering with the prosecutorial function), vacated by Matter of Appointment of Independent Counsel, 766 F.2d 70 (2d Cir. 1985)(dismissing for the threshold issue of lack of standing, and declining to reach the district court's substantive conclusions).  Accordingly, petitioner's motion for a writ of mandamus to direct the Attorney General to appoint a special prosecutor is denied.

 XI.  Conclusion

    For the foregoing reasons: (1) petitioner's motion to appoint a special prosecution is DENIED; (2) petitioner's motion to remove his attorney of record and appoint substitute counsel is DENIED; (3) petitioner's motion to hold an evidentiary hearing is DENIED; (4) petitioner's Rule 33 Motion for a new trial is DENIED; and (5) petitioner's Section 2255 Petition for a writ of habeas corpus is denied.  Because petitioner has not made a substantial showing of the denial of any constitutional right, a certificate of appealability is also denied. 28 U.S.C.

§ 2253. See also Lozada v. United States, 107 F.3d 1011, 1017

(2d Cir.1997), abrogated on other grounds, United States v.

Perez, 129 F.3d 255, 259-60 (2d Cir.1997) (discussing the

standard for issuing a certificate of appealability); see also

Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112-13 (2d

Cir. 2000). The court certifies pursuant to 28 U.S.C. §

1915(a)(3) that any appeal from this Order would not be taken in

good faith, and therefore in forma pauperis status is denied for

purpose of any appeal. See Coppedge v. United States, 369 U.S.

438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).  The Clerk of

the Court is directed to enter judgment accordingly.


SO ORDERED.

                                                             s/ARR
                                           Allyne R. Ross
                                           United States District Judge


Dated:   January 25, 2011
Brooklyn, New York